EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Honorable María de Lourdes Ramos Rivera, por sí y como Vicepresidenta de la Cámara de Representantes de Puerto Rico y el Honorable Carlos Méndez Núñez, por sí y como Presidente de la Cámara de Representantes de Puerto Rico<br><br>Peticionarios<br><br>v.<br><br>Licenciada Emmalind García García<br><br>Recurrida | Certiorari<br><br>2019 TSPR 188<br><br>203 DPR \_\_\_\_ |

Número del Caso:  CC-2018-197


Fecha: 27 septiembre de 2019


Tribunal de Apelaciones:

          Región Judicial de San Juan – Panel V


Abogado de la parte peticionaria:

     Verónica Ferraiuoli Hornedo


Abogados de la parte recurrida:

     Lcda. Emmalind García García – (por derecho propio)
     Lcdo. Guillermo Figueroa Prieto


 Materia: Derecho Constitucional: Legitimación activa de un
          legislador en su carácter individual bajo la doctrina de
          *vote nullification*.



Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Honorable María de Lourdes
Ramos Rivera, por sí y como
Vicepresidenta de la Cámara de
Representantes de Puerto Rico y
el Honorable Carlos Méndez Núñez,
por sí y como Presidente de la
Cámara de Representantes de
Puerto Rico

                                           CC-2018-197      Certiorari

     Peticionarios

       v.

Licenciada Emmalind García García

     Recurrida

     Opinión del Tribunal emitida por el Juez Asociado señor Kolthoff Caraballo

En San Juan, Puerto Rico, a 27 de septiembre de 2019.

En esta oportunidad debemos contestar la siguiente interrogante: ¿posee legitimación activa para presentar una causa de acción sobre anulación del valor o efectividad del voto un legislador particular que, con la anuencia del cuerpo legislativo, emitió un voto de abstención para un nombramiento que por ley requiere el voto de la mayoría absoluta, pero se confirmó con la mayoría simple?

Al contestar en la afirmativa, examinaremos cuáles son los criterios que los tribunales deben ponderar para reconocer la capacidad jurídica de un legislador ante esta clase de reclamo.

I

El 21 de diciembre de 2016 el Hon. Alejandro García Padilla, Gobernador de Puerto Rico (Gobernador), convocó la Quinta Sesión Extraordinaria de la Decimoséptima Asamblea Legislativa mediante el Boletín Administrativo Núm. OE-2016-057 (orden ejecutiva). Posteriormente, el **27 de diciembre de 2016** el Gobernador enmendó la orden ejecutiva para incluir las nominaciones de la Lcda. Emmalind García García (nominada o recurrida) y del Lcdo. Rafael Ortiz Carrión (licenciado Ortiz Carrión) como **miembros alternos** del Panel del Fiscal Especial Independiente (Panel del FEI).[1] Ese día, las nominaciones bajaron a votación ante el pleno de la Cámara de Representantes de Puerto Rico (Cámara).

Antes de comenzar la votación, a través del portavoz de la minoría, Hon. José F. Aponte Hernández, la delegación del Partido Nuevo Progresista (PNP) solicitó el permiso y explicó las razones por las cuales estos representantes se abstendrían de votar en cuanto al nombramiento de los nominados.[2] Acogida la decisión por el

---

[1] Adelantamos que, durante el trámite judicial en el Tribunal de Primera Instancia, el Lcdo. Rafael Ortiz Carrión (licenciado Ortiz Carrión) renunció al cargo de miembro alterno del Panel del Fiscal Especial Independiente (Panel del FEI). Véase, *Sentencia Parcial*, Apéndice de la Petición de *certiorari*, pág. 59.

[2] Surge del Diario de Sesiones de la Cámara de Representantes de Puerto Rico de 27 de diciembre de 2016 que, en relación con la solicitud de abstención del voto de la entonces minoría parlamentaria, el representante Hon. José F. Aponte Hernández estableció la postura de la delegación Partido Nuevo Progresista al señalar:

Las disposiciones sobre el nombramiento de Miembros del Panel del Fiscal Especial Independiente disponen que la

entonces Presidente Incidental de la Cámara, Hon. Carlos Hernández López, (Presidente Incidental) procedieron a votar. El escrutinio electrónico reflejó que la votación final de la Cámara fue la siguiente: 24 votos a favor, 0 en contra, 14 abstenidos y 13 ausentes. Luego de concluida la votación, el Presidente Incidental pronunció la confirmación de los nombramientos en la Cámara, por lo que éstos se refirieron para el consejo y consentimiento del Senado de Puerto Rico (Senado).

El **28 de diciembre de 2016** el Senado consideró los nombramientos de los nominados y la votación final resultó en 20 votos a favor, 4 en contra y 3 ausentes. Ante este cuadro, el Secretario del Senado le notificó al Gobernador, al Secretario de Estado y al Presidente en funciones de la

---

Cámara de Representantes también entrará en lo que es consejo y consentimiento para la confirmación de los mismos.

En la noche de hoy se está trayendo ante este Cuerpo a dos personas para ser parte del Panel de Fiscal Especial Independiente. Personas que han estado en la judicatura por tiempo, incluyendo en el Tribunal de Apelaciones de Puerto Rico. Podemos entender de cualificaciones que puedan tener las personas, sin embargo, la realidad es que no se ha dado el tiempo para que uno pueda intercambiar con los designados, con los nominados. No hay oportunidad de uno poder saber sobre la línea que pudiesen tener en un momento dado en lo que es un proceso de investigación. Y no queriendo ser injustos con ellos; que de hecho, tengo que decir, que en cierta manera son ustedes los que están siendo injustos con ellos, al no permitir que uno tenga un intercambio con los designados y uno pueda tomar entonces una determinación de en vez de oponerse o de abstenerse, poder concurrir con la certificación del consejo y consentimiento positivo de los nominados.

Así que, ante estas circunstancias, señor Presidente, nuestra delegación, estará solicitando que se le permita abstenerse en ambos nombramientos.

Esas son nuestras palabras, señor Presidente. Apéndice de la Petición de *certiorari*, pág. 80.

Cámara que el Senado había dado su consejo y consentimiento a los nombramientos de los nominados como miembros alternos del Panel del FEI. A pesar de que el 29 de diciembre de 2016 el Gobernador le extendió el nombramiento a la recurrida como miembro alterno del Panel del FEI, ésta juramentó para el cargo el 3 de enero de 2017.[3]

Por otro lado, el 2 de enero de 2017 se constituyó la Decimoctava Asamblea Legislativa. Los miembros de la delegación del PNP -como nueva mayoría parlamentaria- escogieron al Hon. Carlos Méndez Núñez como Presidente de la Cámara y a la Hon. María de Lourdes Ramos Rivera como Vicepresidenta de ese cuerpo legislativo. Ambos representantes pertenecieron a la delegación del partido de minoría que, durante la Decimoséptima Asamblea Legislativa, se abstuvieron de votar para el nombramiento de la recurrida.

II

Por estos hechos, los representantes Hon. Carlos Méndez Núñez y Hon. María de Lourdes Ramos Rivera, por sí y como Presidente y Vicepresidenta de la Cámara (peticionarios) presentaron una *Sentencia Declaratoria* ante el Tribunal de Primera Instancia en contra de la recurrida el 20 de enero de 2017.

---

[3] Surge del expediente que aun cuando la Lcda. Emmalind García García (nominada o recurrida) juramentó fidelidad para la toma de posesión del cargo el 3 de enero de 2017, no fue hasta el 9 de enero de 2017 que el juramento entró al Registro de Nombramientos del Gobernador. Apéndice de Petición de *certiorari*, pág. 75.

En esencia, los peticionarios alegaron que ellos y los demás legisladores están sujetos a la jurisdicción exclusiva del Panel del FEI para investigar y procesar acciones penales que involucren a los miembros de la Asamblea Legislativa. Por ello, y como cuestión de umbral, afirmaron que **la recurrida no contó con el voto de la mayoría del número total de miembros que estaba compuesta la Decimoséptima Asamblea Legislativa de la Cámara conforme lo exige el Art. 10 de la Ley del Panel del FEI**, *infra*.[4] Los peticionarios aseveraron que la pretensión de la recurrida es ocupar el cargo de manera ilegal y la permisibilidad de que permanezca en el puesto lacera a perpetuidad los poderes y prerrogativas de la Cámara que ejerce su consejo y consentimiento para el nombramiento de los miembros del Panel del FEI. Así las cosas, los peticionarios solicitaron al foro de instancia que dictara una *Sentencia* para declarar *ultra vires* el nombramiento de la recurrida como miembro alterno del Panel del FEI.

Además de la ilegalidad del nombramiento, los peticionarios suplicaron que el tribunal de instancia emitiera un entredicho provisional y un interdicto preliminar para impedir que la recurrida ocupara el cargo y un interdicto permanente para evitar que ejerciera las funciones del puesto. Sin embargo, durante la vista de interdicto preliminar y permanente celebrada el 26 de enero

---

[4] Cabe señalar de que no existe controversia de que la Cámara de Representantes de Puerto Rico (Cámara) de la Decimoséptima Asamblea Legislativa estaba compuesta por 51 representantes.

de 2017, la recurrida presentó evidencia relacionada a la juramentación del cargo, por lo que el foro de instancia declaró académico este último reclamo.[5]

Así el trámite, la recurrida solicitó la desestimación de la *Demanda Jurada* bajo el entendido de que los peticionarios no tienen legitimación activa para entablar la causa de acción.[6] En apoyo a su argumento, la recurrida esbozó que las alegaciones relacionadas al daño son una preocupación especulativa e hipotética de que en un futuro los peticionarios y los demás miembros de la Legislatura pudieran ser objeto de una investigación que ella condujera como miembro alterno del Panel del FEI. Del mismo modo, adujo que los peticionarios no demostraron los daños personales, claros y palpables y con su participación quedó probado que no hubo un menoscabo a sus prerrogativas legislativas. La recurrida sostuvo que, de ser este último el reclamo de los peticionarios, la causa de acción es improcedente toda vez que tampoco satisficieron el requisito de legitimación pasiva al ser una ciudadana que no se nominó ni participó en los procesos legislativos de la Decimoséptima Asamblea Legislativa.

---

[5] Surge de la *Minuta Resolución*, que las partes intercambiaron documentos y, ante la renuncia del licenciado Ortiz Carrión al cargo antes de que expirara el término para juramentar, los peticionarios desistieron de las alegaciones en contra del letrado. Apéndice de Petición de *certiorari*, págs. 60-62.

[6] Apéndice de Petición de *certiorari*, págs. 64-70.

En segundo lugar, la recurrida aseveró que la comparecencia de los peticionarios en su carácter de Presidente y Vicepresidenta de la Cámara de la Decimoctava Asamblea Legislativa no les concede legitimación activa para defender los intereses de los miembros ni representar a la extinta Decimoséptima Asamblea Legislativa a la que se imputó proceder contrario a la legislación creadora de la Oficina del Panel del FEI. Sobre este aspecto, la recurrida alegó que los peticionarios no presentaron evidencia que acreditara la autorización de la Cámara para representar al cuerpo legislativo del cual forman parte.

Finalmente, la recurrida señaló que la intervención y el remedio pretendido por los peticionarios viola la Sec. 9 del Art. III de la Constitución del Estado Libre Asociado de Puerto Rico con relación a la facultad de cada cámara de adoptar las reglas de procedimiento y de gobierno interno de los cuerpos legislativos.[7] Por ello, aseveró que la confirmación de su nombramiento era un asunto de la Cámara resuelto conforme a su reglamento y al presidente que lo interpretó, por lo que la intervención del tribunal de instancia constituiría una violación al principio de separación de poderes.

Por su parte, los peticionarios se opusieron a la solicitud de desestimación y plantearon que gozan de un **interés legítimo de que sus votos no sean anulados ni su participación en el proceso de confirmación sea**

_____

[7] Const. ELA, LPRA, Tomo 1, ed. 2016, pág. 402.

**menoscabada.** Los peticionarios manifestaron tener un interés legítimo de que "la determinación institucional de no prestar su consejo y consentimiento para la nominación de [la recurrida] sea respetad[a]".[8] Finalmente, esbozaron que el presente caso **no trata de un fallido debate legislativo mediante el cual los legisladores procuran que el tribunal imponga un criterio sobre el cual éstos no hayan podido convencer a sus compañeros, sino que ganaron el debate legislativo porque la nominada no obtuvo los votos necesarios para su confirmación.**

El Tribunal de Primera Instancia le ordenó a la recurrida replicar a la oposición de la solicitud de desestimación de los peticionarios.[9] En su *Escrito de Réplica en Cumplimiento de Orden*, la recurrida reiteró su postura en cuanto a la ausencia de legitimación activa de los peticionarios y añadió que éstos "[s]encillamente estuvieron presentes, guardaron silencio, aceptaron que se registrara su voto como abstenido y no pidieron reconsideración de la determinación del Presidente incidental de determinar que el nombramiento se había confirmado".[10] Estos argumentos fueron base para una dúplica presentada por los peticionarios en la que resaltaron que la confirmación de la nominada se debió a

---

[8] *Oposición a "Moción de Desestimación"*, Apéndice de la Petición de *certiorari*, pág. 237.

[9] Apéndice de Petición de *certiorari*, pág. 243.

[10] *Escrito de Réplica en Cumplimiento de Orden,* Apéndice de la Petición de *certiorari*, pág. 251.

**un error en la interpretación** del Presidente Incidental sobre el resultado de la votación. **El efecto de esta interpretación fue anular los votos de los legisladores que no votaron a favor del nombramiento**.

El Tribunal de Primera Instancia dictó una *Sentencia* en la que desestimó la causa de acción al determinar que los peticionarios carecen de legitimación activa en representación de la Decimoséptima ni la Decimoctava Asamblea Legislativa, así como tampoco en su carácter individual.

El foro sentenciador razonó que los peticionarios no demostraron que estaban investidos por la Cámara para representar a la Decimoctava Asamblea Legislativa en la demanda y, aun si existiera una resolución al respecto, "sería jurídicamente inadecuado concluir que los demandantes pudieran instar esta causa de acción en representación de la **extinta** Cámara de Representantes de la Decimoséptima Asamblea Legislativa, cuyas funciones cesaron en el 2016 y, al presente, no existe".[11]

En cuanto a la legitimación activa de los peticionarios para presentar la causa de acción en su carácter propio, el foro de instancia determinó que, si bien éstos fueron miembros de la Decimoséptima Asamblea Legislativa, **se abstuvieron de votar y así sus votos fueron contabilizados**. Por ello, el tribunal sentenciador decretó que los peticionarios no demostraron el menoscabo

---

[11] Apéndice de Petición de *certiorari*, pág. 273.

a sus prerrogativas legislativas. A pesar de la alegación de los peticionarios sobre la insuficiencia en los votos exigidos por legislación para la aprobación del nombramiento de la recurrida en la Cámara, el foro de instancia entendió que éstos tampoco abundaron sobre la conexión entre el daño sufrido y la causa de acción ejercitada.

El Tribunal de Primera Instancia expresó que los peticionarios, en el ejercicio de las funciones fiscalizadoras, debieron utilizar los mecanismos **"razonables** y **necesarios"** para viabilizar su participación plena en todas las etapas críticas del proceso legislativo.[12] En ese contexto, dispuso que los peticionarios estuvieron presentes durante la lectura del *Informe de la Comisión de Gobierno* sobre la designación de la recurrida y, por ello, tuvieron ante sí las cualificaciones de la nominada. En fin, según el foro de instancia, la pretensión de los peticionarios era procurar la intervención judicial con la interpretación del Reglamento de la Cámara, *infra*, realizada por el Presidente Incidental al momento de considerar los votos necesarios para el nombramiento de la recurrida. Es decir, los peticionarios propusieron trasladar el debate legislativo al foro judicial.

Inconforme con la decisión, los peticionarios acudieron sin éxito ante el Tribunal de Apelaciones.

---

[12] Apéndice de Petición de *certiorari*, pág. 274.

Allí, éstos **<u>reiteraron que poseen legitimación activa</u>** **<u>porque tienen un interés legítimo de que sus votos no sean</u>** **<u>anulados completamente y, por ende, su participación en el</u>** **<u>proceso legislativo se menoscabe</u>**. Según los peticionarios, el tribunal de instancia tenía la facultad para considerar la corrección legal de la determinación del Presidente Incidental de la Cámara relacionado al **efecto de los votos** **sobre el consejo y consentimiento a la nominación de la** **recurrida sin afectar la doctrina de la separación de** **poderes.**

Por su parte, la recurrida presentó su oposición a la impugnación de la *Sentencia*. En esencia, insistió en todos los argumentos presentados ante el foro de instancia.[13]

Así las cosas, el Tribunal de Apelaciones confirmó la *Sentencia* del foro apelado. El foro apelativo intermedio determinó que los peticionarios: (1) en vez de votar en contra de la confirmación de la recurrida se abstuvieron de emitir su voto, (2) no alegaron el menoscabo de sus prerrogativas legislativas, y (3) los daños manifestados son especulativos porque descansan en que, tal vez, en el futuro, uno de los legisladores podría ser objeto de alguna actuación de la recurrida en el

---

[13] En resumen, la recurrida argumentó que los peticionarios presentaron y comparecieron en la *Demanda Jurada* como Presidente y Vicepresidenta de la Decimoctava Asamblea Legislativa para impugnar una determinación de la Decimoséptima Asamblea Legislativa que ya no existe, por lo que cualquier imputación de error de los trabajos que realizó ésta es improcedente en Derecho. Reiteró que la postura de los peticionarios relacionada al daño sufrido depende de supuestos especulativos e hipotéticos y no pueden ser considerados suficientes en Derecho para la reclamación de un menoscabo a sus prerrogativas legislativas.

ejercicio de sus funciones. Finalmente, determinó que la comparecencia de los peticionarios a nombre de la Cámara era improcedente toda vez que el cuerpo legislativo no demostró cómo se había violentado su prerrogativa constitucional en cuanto al descargue de su función de confirmación del nombramiento de la recurrida.

Oportunamente, los peticionarios recurrieron ante nos mediante una Petición de *certiorari*. En síntesis, los peticionarios plantean que poseen legitimación activa para reivindicar tanto el valor de sus votos como la prerrogativa de la Cámara de rechazar la nominación de la recurrida como miembro alterno del Panel del FEI.

Por su parte, la recurrida reiteró que no se coartó la participación de los peticionarios en el trámite legislativo para cumplir con el requisito del daño claro y palpable, sino, además, éstos tenían que demostrar que la recurrida fue la causante del daño.

Para delimitar la controversia que consideramos, y debido a que los peticionarios no acreditaron que la Cámara los autorizó a presentar la causa de acción a nombre del Cuerpo, no atenderemos si la Cámara posee o no legitimación activa. Ahora bien, resta determinar si los peticionarios poseen legitimación activa en su carácter individual conforme a la doctrina de *vote nullification*.

III

A.   <u>Legitimación activa</u>

El concepto de justiciabilidad requiere la existencia de un caso o controversia real para que los tribunales puedan ejercer válidamente el poder judicial.[14] De modo que la intervención del tribunal tendrá lugar únicamente si existe una controversia genuina surgida entre partes opuestas que tienen un interés real en obtener un remedio que afecte sus relaciones jurídicas.[15]

No se considera una controversia justiciable cuando: "(1) se procura resolver una cuestión política; (2) una de las partes carece de legitimación activa; (3) hechos posteriores al comienzo del pleito han tornado la controversia en académica; (4) las partes están tratando de obtener una opinión consultiva, o (5) se intenta promover un pleito que no está maduro".[16] Éstas son las doctrinas de autolimitación judicial.

En particular, la doctrina de legitimación activa se define como "la capacidad que se le requiere a la parte promovente de una acción para comparecer como litigante ante el tribunal, realizar con eficiencia actos procesales y, de esta forma, obtener una sentencia vinculante".[17] A través de la legitimación activa el

---

[14] Suárez Cáceres v. Com. Estatal Elecciones, 176 DPR 31, 60 (2009); Com. de la Mujer v. Srio. de Justicia, 109 DPR 715, 720 (1980).

[15] Suárez Cáceres v. Com. Estatal Elecciones, supra, citando ELA v. Aguayo, 80 DPR 552, 558-559 (1958).

[16] Bhatia Gautier v. Gobernador, 199 DPR 59, 68-69 (2017), citando a Asoc. Fotoperiodistas v. Rivera Schatz, 180 DPR 920, 932 (2011) y a Noriega v. Hernández Colón, 135 DPR 406, 421-422 (1994).

[17] Bhatia Gautier v. Gobernador, supra, pág. 69.

promovente procura demostrarle al tribunal que su interés es "de tal índole que, con toda probabilidad, habrá de proseguir su causa de acción vigorosamente y habrá de traer a la atención del tribunal las cuestiones en controversia".[18] De manera que, ante la falta de una ley que expresamente la confiera, existe legitimación activa cuando: "(1) la parte que reclama ha sufrido un daño claro y palpable; (2) el daño es real, inmediato y preciso, no abstracto o hipotético; (3) existe una relación causal razonable entre la acción que se ejecuta y el daño alegado, y (4) la causa de acción surge al amparo de la Constitución o de alguna ley".[19]

**Cuando la causa de acción se presenta <u>en contra</u> de agencias y <u>funcionarios gubernamentales</u>, los tribunales interpretarán los criterios de la legitimación activa de manera flexible y liberal y el análisis de las alegaciones se debe hacer de la manera más favorable y liberal <u>para el promovente del litigio</u>.**[20]

B.    <u>Legitimación activa de los legisladores</u>

En distintas oportunidades hemos reconocido los escenarios en los cuales un legislador posee legitimación activa. Para ello, al igual que un ciudadano particular,

---

[18] <u>Sánchez et al. v. Srio. de Justicia et al.</u>, 157 DPR 360, 371 (2002), <u>Hernández Agosto v. Romero Barceló</u>, 112 DPR 407, 413 (1982).

[19] <u>Acevedo Vilá v. Meléndez</u>, 164 DPR 875, 885 (2005) citando a <u>P.P.D. v. Gobernador I</u>, 139 DPR 643 (1995); <u>Hernández Torres v. Hernández Colón et al.</u>, 131 DPR 593 (1992); <u>Hernández Agosto v. Romero Barceló</u>, *supra*.

[20] <u>Bhatia Gautier v. Gobernador</u>, *supra*, págs. 69-70.

un legislador tiene que cumplir con los requisitos de *standing*.[21]

A través de la jurisprudencia hemos avalado que un legislador ostenta capacidad jurídica si: (1) defiende un interés individual tradicional vinculado con el proceso legislativo e invocado frente a funcionarios del Cuerpo tanto en su carácter particular como en representación de un grupo de dicho Cuerpo,[22] (2) impugna una actuación ilegal del ejecutivo,[23] (3) las reglas senatoriales coartan su derecho constitucional de participar en las etapas esenciales y significativas en las comisiones del Cuerpo,[24] (4) cuestiona las reglas senatoriales que impugna el intento del Senado de excluir a un senador de su escaño mientras se determina la validez de su elección,[25] (5) para "solicitar un injunction y sentencia declaratoria con el objetivo de cuestionar que una persona está ocupando un cargo en detrimento de su poder de confirmación"(Énfasis en el original);[26] y (6) para vindicar su prerrogativa y función constitucional como lo es la participación en el proceso de confirmación de consejo y

---

[21] Bhatia Gautier v. Gobernador, *supra*, pág. 71.

[22] Noriega v. Hernández Colón, *supra*, pág. 428.

[23] Íd.

[24] Silva v. Hernández Agosto, 118 DPR 45 (1986).

[25] Santa Aponte v. Srio. del Senado, 105 DPR 750 (1977).

[26] Senado de Puerto Rico v. Hon. Pedro Pierluisi Urrutia, 2019 TSPR 138, 203 DPR ___ (2019) citando a Hernández Agosto v. López Nieves, 114 DPR 601, 646 (1983).

consentimiento de un nombramiento de un funcionario público.[27]

Ahora bien, debemos dejar claro que, tanto en los foros federales como en los estados de la unión, resulta difícil reconocer la legitimación activa de un legislador en su carácter individual.[28] Por ello, además de analizar de manera favorable y liberal las alegaciones del legislador, es necesario examinar las particularidades de los hechos de forma detallada.

En Hernández Agosto v. Romero Barceló, 112 DPR 407, 415 (1982), sucedió que el primer mandatario del País omitió enviar el nombramiento de un funcionario público que continuaría en el equipo de trabajo del Gobernador de Puerto Rico durante el segundo término de su mandato. El Presidente del Senado impugnó la actuación del primer ejecutivo y reclamó que el proceder violentó su prerrogativa legislativa de impartir su consejo y consentimiento. Trabada la controversia, resolvimos que los legisladores poseen legitimación activa al tener "un interés legítimo en participar en el proceso constitucional de impartir consejo y consentimiento a la nominación de funcionarios públicos".[29] Este Tribunal alcanzó esa conclusión luego de examinar jurisprudencia de

---

[27] Hernández Agosto v. Romero Barceló, *supra*, pág. 415.

[28] Noriega v. Hernández Colón, *supra*, pág. 431.

[29] Hernández Agosto v. Romero Barceló, *supra*, pág. 416 (1982). Véase además, Nogueras v. Hernández Colón, 127 DPR 638, 644 (1991).

otras jurisdicciones de las cuales aludimos a la

siguiente:

> En Kennedy v. S[a]mpson, 511 F.2d 430 (1974),
> se reconoció la capacidad jurídica de un
> miembro del Senado **para proteger la**
> **efectividad de su voto** en una ley a la cual el
> Presidente de los Estados Unidos le había
> impartido un veto de bolsillo. (Énfasis
> nuestro).[30]

Resulta importante señalar que, como discutiremos en

detalle más adelante, Kennedy v. Sampson, *supra,* se

resolvió conforme a la norma pautada por el Tribunal

Supremo Federal en Coleman v. Miller, 307 US 433 (1939).

En Coleman v. Miller, *supra*, el Senado de Kansas

contaba con 40 miembros de los cuales 20 se opusieron a

la ratificación de la enmienda a la Constitución de

Estado Unidos sobre el trabajo infantil (*Child Labor*

*Amendment*). La consecuencia del empate en la votación

procuró el voto decisivo del vicegobernador. Ante este

cuadro, los senadores que votaron en contra de la

ratificación presentaron una causa de acción para impedir

la contabilización del voto del desempate. Aun cuando el

Tribunal Supremo Federal se encontró igualmente dividido

en cuanto a los méritos de la controversia, sí determinó

que los demandantes tenían legitimación activa bajo el

razonamiento siguiente:

> Here, the plaintiffs include twenty senators,
> **whose votes against ratification have been**
> **overridden and virtually held for naught**
> although if they are right in their
> contentions **their votes would have been**

---

[30] Hernández Agosto v. Romero Barceló, *supra*, págs. 415-416.

> **sufficient to defeat ratification. We think that these senators have a plain, direct and adequate interest in maintaining the effectiveness of their votes**. Petitioners come directly within the provisions of the statute governing our appellate jurisdiction. They have set up and claimed a right and privilege under the Constitution of the United States to have their votes given effect and the state court has denied that right and privilege. (Énfasis nuestro).[31]

Como mencionamos, el Máximo Foro Federal no consideró los méritos de la controversia, pero manifestó que -si los senadores estaban en lo correcto- **los votos en contra de la ratificación de la enmienda propuesta fueron anulados y, para todo efecto práctico, quedaron en nada.** De este modo, para el Tribunal Supremo Federal no hubo duda de que, aun cuando los demandantes participaron del proceso legislativo, los legisladores **tenían un interés claro, directo y adecuado en mantener la efectividad de sus votos, derecho y privilegio denegado por la corte estatal**.

Por otro lado, si bien el Foro Supremo Federal permitió este tipo de causa de acción, hemos manifestado que Coleman v. Miller, *supra*, no estableció unos criterios al momento de evaluar un reclamo sobre la anulación de la efectividad de un voto legislativo que nos permita intervenir sin considerar el riesgo de infringir el principio de separación de poderes.[32]

---

[31] Coleman v. Miller, 307 US 433, 438 (1939).

[32] Noriega v. Hernández Colón, *supra*, esc.24, pág. 432.

Posteriormente, el Tribunal de Apelaciones para el Circuito del Distrito de Columbia tuvo ante sí a Kennedy v. Sampson, *supra*. Los hechos de este caso se originaron cuando un senador votó a favor de una medida legislativa en la que el Presidente de los Estados Unidos procuró un veto de bolsillo. Por ello, el senador presentó una causa de acción en contra del Administrador de la Administración de Servicios Generales y del Jefe de los Registros de la Casa Blanca para que publicaran que la medida legislativa había cobrado vigencia en la fecha en que se expiró el término que dispone la Constitución de los Estados Unidos para que el primer mandatario firmara el proyecto de ley. El senador afirmó que el receso no era impedimento para que el Presidente devolviera la medida legislativa firmada.

Por su parte, los demandados argumentaron que la medida no se aprobó a raíz del veto de bolsillo, que el senador no representaba al Congreso y, por tal motivo, carecía de capacidad jurídica para su reclamo. Para sustentar sus contenciones, las partes se apoyaron en la misma cláusula constitucional y en la decisión de Coleman v. Miller, *supra*.

En cuanto a los argumentos de las partes, el Tribunal de Apelaciones Federal para el Distrito de Columbia dispuso:

> That provision, article I, section 7, is one of several in the Constitution which implement the 'separation of powers' doctrine. Taken

together, these provisions define the prerogatives of each governmental branch in a manner which prevents overreaching by any one of them. **The provision under discussion allocates to the executive and legislative branches their respective roles in the law-making process. When either branch perceives an intrusion upon its legislative power by the other, this clause is appropriately invoked. The gist of appellee's complaint is that such an intrusion has occurred as a result of the President's misinterpretation of this clause and that a consequence of this intrusion is the nullification of appellee's vote in favor of the bill in question;** hence, the complaint alleges injury to an interest of appellee as a member of the legislative branch of the government, an interest among those protected by article I, section 7[…].

Appellants correctly point out that the votes of the twenty plaintiffs in Coleman had peculiar legal significance as a bloc, i.e.: these votes were sufficient to prevent ratification absent the challenged vote of the Lieutenant Governor. Appellants read Coleman as holding that the plaintiff legislators had standing only as a group for the purpose of protecting the collective effectiveness of their votes. In a like vein, appellants contend that appellee's vote in favor of S. 3418 has no legal significance independent of the other votes in favor of the bill. Any injury to him occasioned by the President's action, it is argued, is 'derivative' in nature. In appellants' view, only the Senate or the Congress has sustained the 'direct' injury necessary to confer standing (assuming that the veto of S. 3418 was invalid).[33]

El foro apelativo federal razonó que el interés del senador no era directo sino uno indirecto o derivativo, pero éste era uno sustancial al expresar:

In the present case, appellee has alleged that conduct by officials of the executive branch amounted to an illegal nullification not only of Congress' exercise of its power, but also of appellee's exercise of his power. In the

---

[33] Kennedy v. Sampson, 511 F.2d 430, 434 (1974).

> language of the Coleman opinion, appellee's
> object in this lawsuit is to vindicate the
> effectiveness of his vote. No more essential
> interest could be asserted by a legislator. We
> are satisfied, therefore, that the purposes of
> the standing doctrine are fully served in this
> litigation.[34]

En varias ocasiones Kennedy v. Sampson, *supra*, nos ha servido como base para determinar si un legislador posee o no legitimación activa en su carácter individual. Así, cuando este Tribunal declaró en Hernández Torres v. Hernández Colón, 129 DPR 824 (1992) que los legisladores no tenían legitimación activa para vindicar un **interés general**, reiteramos la norma de que el legislador posee *standing* **para vindicar su interés personal en cuanto al ejercicio de sus prerrogativas, tanto directa como derivada**.[35]

Previamente señalamos que, tanto en los foros federales como en los estados de la unión, resulta difícil reconocer la legitimación activa de un legislador particular. En lo concerniente a esta ardua tarea, hemos expresado que:

> La dificultad en estos casos estriba en
> precisar cuál, o cuáles, son las prerrogativas
> que validan reconocer una acción de un
> legislador particular --que no goza del apoyo
> de uno o los dos cuerpos legislativos-- y que
> se han visto afectados por el poder ejecutivo.
> **El Tribunal Supremo federal no ha pautado los
> criterios en torno a dicha norma**. Tanto los
> tribunales federales, como los comentaristas

---

[34] Kennedy v. Sampson, *supra*, pág. 436.

[35] Hernández Torres v. Hernández Colón, 129 DPR 824, 842 (1992), citando a Hernández Agosto v. Romero Barceló, *supra* y a Kennedy v. Sampson, *supra*.

en este ámbito, discrepan marcadamente en cuanto a si debe conferírsele legitimación activa a un legislador particular. Algunas de las objeciones reconocidas en la jurisdicción federal para negarle legitimación activa a un legislador particular fueron esbozadas y adoptadas en los casos antes citados de [Hernández Torres v. Hernández Colón, 129 DPR 824, 837 (1992)]. **No obstante, estas instancias, en la jurisdicción federal se le ha reconocido legitimación activa a un legislador particular cuando este ha demostrado la anulación de un vot[o] pasado o futuro que puede ser razonablemente vinculada con la acción impugnada**, […].[36]

Estas expresiones nos llevaron a concluir en Noriega v. Hernández Colón, 135 DPR 406 (1994), que el representante Hon. David Noriega Rodríguez carecía de legitimación activa porque no demostró que la firma del Gobernador, para la aprobación de las resoluciones conjuntas que con su voto favoreció, le causó un daño claro y palpable a sus prerrogativas legislativas **ni que se hubiese anulado su voto pasado**[37]

Posterior a esta decisión, el Foro Supremo Federal atendió Raines v. Byrd, 521 US 811 (1997). Los hechos de

---

[36] Noriega v. Hernández Colón, *supra*, 431-433 (1994).

[37] Es menester señalar que el representante, Hon. David Noriega Rodríguez (representante Noriega Rodríguez) votó a favor de una de las Resoluciones Conjuntas que posteriormente impugnó. Debido a que el representante Noriega Rodríguez no combatió legislativamente las Resoluciones no encontramos base para entender que la aprobación por parte del Gobernador le hubiese causado un daño claro y palpable a sus prerrogativas legislativas. De este modo, contrario a Kennedy v. Sampson, *supra*, consideramos que la firma del Primer Ejecutivo, "no anuló el voto pasado del Representante Noriega; todo lo contrario, favoreció la posición que éste asumió en la aprobación de las referidas medidas." Por ello, entendimos que el "Representante Noriega Rodríguez no tenía legitimación activa para impugnar una Ley, la cual él con su actuación legislativa favoreció". Noriega v. Hernández Colón, *supra*, pág. 433.

este caso se remontan cuando el Senado aprobó un proyecto de ley intitulado Ley de Veto de Línea (*Line Item Veto Act*) con una votación de 69 a 31. Al día siguiente, la Cámara de Representantes Federal aprobó el proyecto con una votación de 232 a 177. Luego de la aprobación de la ley, 6 congresistas impugnaron la legislación aprobada porque permitía que, luego de convertida en ley, el Presidente omitiera el requisito de la ponderación previa por los cuerpos legislativos y quedó autorizado para cancelar ciertas medidas de gastos y beneficios fiscales. En palabras más sencillas, el poder extendido al Presidente, según alegaron los legisladores, disminuyó el poder institucional del Congreso.

Esta legislación expresamente confería *standing* a los miembros del Congreso o a particulares que se afectaran con la promulgación de la ley. Sin embargo, el daño concreto y directo alegado por los legisladores se basó en sus capacidades oficiales y, al momento que presentaron la causa de acción, el Presidente no había ejercido la facultad concedida por el estatuto. Por lo tanto, respecto a este asunto, el caso no estaba maduro.

En lo pertinente al reclamo de la efectividad de la votación, los legisladores argumentaron que la ley promulgada causó **un tipo de daño institucional** en la medida que resultó en una **disminución del poder legislativo** que necesariamente provocaba un daño a los legisladores del Congreso. Asimismo, alegaron que

ostentaban legitimación activa basado en la pérdida del poder político y no en la pérdida de un derecho personal.

Por lo antes señalado, el Tribunal Supremo de Estados Unidos determinó que los demandantes no tenían *standing* precisamente porque el daño era institucional y no lo suficientemente concreto y personal porque los congresistas **poseían un remedio político adecuado** en la medida que posteriormente podían votar para derogar el estatuto o para proporcionar proyectos de ley de gastos individuales con una exención legal.[38]

La conclusión alcanzada por el Foro Supremo Federal se fundamentó en un claro contraste del caso con lo resuelto en Coleman v. Miller, *supra*, al establecer lo siguiente:

> It is obvious, then, that our holding in *Coleman* stands […] for the proposition that legislators **whose votes would have been sufficient to defeat (or enact) a specific legislative Act have standing to sue if that legislative action goes into effect (or does not go into effect), on the ground that their votes have been completely nullified**.
>
> It should be equally obvious that appellees' claim does not fall within our holding in *Coleman,* as thus understood. **They have not alleged that they voted for a specific bill, that there were sufficient votes to pass the bill, and that the bill was nonetheless deemed defeated. In the vote on the Act, their votes were given full effect.** They simply lost that vote. Nor can they allege that the Act will nullify their votes in the future in the same way that the votes of the *Coleman* legislators had been nullified. In the future, a majority of Senators and Congressmen can pass or reject appropriations bills; the Act has no effect on this process. In addition, a majority of

---

[38] Raines v. Byrd, 521 US 811, 829 (1997).

> Senators and Congressmen can vote to repeal the Act, or to exempt a given appropriations bill (or a given provision in an appropriations bill) from the Act; again, the Act has no effect on this process. *Coleman* thus provides little meaningful precedent for appellees' argument. (Énfasis nuestro) (Citas omitidas)[39]

Asimismo, señaló que el uso de la palabra "efectividad" para aplicar la norma sentada en Coleman v. Miller, *supra*, sería extender más allá el contexto de lo pretendido en la Opinión. La razón vertida por el Foro Federal relacionado a este asunto es que "[t]here is a vast difference between the **level of vote nullification** at issue in *Coleman* and the **abstract dilution of institutional legislative power** that is alleged here".[40]

Obsérvese que, contrario a Coleman v. Miller, *supra*, en Raines v. Byrd, *supra*, el Tribunal Supremo Federal desarrolló un *test* para conferir legitimación activa por *vote nullification*, a saber: los legisladores cuyos votos hubiesen sido suficientes para derrotar (o promulgar) un proyecto de ley poseen capacidad jurídica para demandar basado en que sus votos han sido completamente anulados, si la legislación entra en vigor (o no entra en vigor). (Traducción nuestra).

Así, mediante el *test* se examinaron las alegaciones y las particularidades del caso para así develar si en efecto se anuló la efectividad del voto de los

---

[39] Raines v. Byrd, *supra*, págs. 823-824.

[40] Íd., pág. 826.

legisladores o simplemente perdieron la batalla legislativa. Es decir, los legisladores tenían que alegar que: (1) votaron por un proyecto de ley específico; (2) los votos de los legisladores tuvieron pleno efecto en la votación; (3) que hubo votos suficientes para aprobar la medida, pero se consideró derrotada; y (4) como consecuencia de lo anterior, sus votos fueron anulados. En relación con este último elemento, según la delimitación que Raines v. Byrd, *supra*, formuló de Coleman v. Miller, *supra*, **ocurre lo mismo si hubo los votos suficientes para derrotar la pieza legislativa, pero se consideró aprobada por el cuerpo legislativo**.

Además, el Alto Foro Federal instruyó a los tribunales que es importante considerar la existencia de **un remedio legislativo adecuado** y **si otra persona podría impugnar la actuación legislativa**.[41]

Contrario a algunas decisiones de tribunales federales inferiores, no creemos que Raines v. Byrd, *supra*, haya revocado *sub silentio* la decisión de Kennedy v. Sampson, *supra*, en el contexto de la concesión de legitimación activa a un legislador particular que haya comparecido sin permiso del cuerpo legislativo y que, como consecuencia de las acciones del ejecutivo, se haya anulado su voto.[42]

---

[41] Raines v. Byrd, *supra*, pág. 829.

[42] Es claro que Raines v. Byrd, *supra*, redujo la interpretación de Coleman v. Miller, *supra*, en cuanto a lo que implica la efectividad del voto limitando la capacidad jurídica de un legislador cuando los

Recientemente, el Tribunal Federal para el Distrito de Columbia emitió una opinión y orden en <u>Blumenthal v. Trump</u>, 335 F. Supp.3d 45 (2018) y discutió ampliamente los precedentes del Tribunal Supremo Federal y del Tribunal de Apelaciones para el Circuito del Distrito de Columbia. Lo anterior para concluir que las acciones del Presidente Donald J. Trump de aceptar emolumentos sin el consentimiento del Congreso constituían una violación a la Constitución de los Estados Unidos y resultó en la anulación del voto de los congresistas.

Entre los asuntos discutidos, citando a <u>Campbell v. Clinton</u>, 203 F.3d 19 (2000), el caso reprodujo la evaluación de la palabra "nullification" dentro del contexto de <u>Raines v. Byrd</u>, *supra*, al manifestar lo siguiente:

> We think the key to understanding the Court's treatment of *Coleman* and its use of the word nullification is its implicit recognition that a ratification vote on a constitutional amendment is an **unusual situation**. It is not at all clear whether once the amendment was "deemed ratified," *see Raines,* 521 U.S. at 822, 117 S.Ct. 2312, the Kansas Senate could have done anything to reverse that position. We think that must be what the Supreme Court implied when it said the *Raines* plaintiffs could not allege that the "[Line Item Veto Act] would nullify their votes *in the future,*" and that, after all, a majority of senators and congressmen could always repeal the Line Item Veto Act. *Id.* at 824, 117 S.Ct. 2312 (emphasis added). The *Coleman* senators, by contrast, may well have been powerless to rescind a ratification of a

---

votos hayan sido suficientes para derrotar o promulgar una medida legislativa específica que entre o no en vigor, contención basada en que sus votos han sido completamente anulados. Véase además, <u>Chenoweth v. Clinton</u>, 181 F.3d 112, 116-17 (1999).

constitutional amendment that they claimed had been defeated. In other words, **they had no legislative remedy.** (Énfasis nuestro).[43]

Nótese que al interpretar la palabra anulación, ésta se refiere a una situación inusual y que, de no tomar acción, se ata a un resultado irreversible. **Recordemos que, según <u>Raines v. Byrd</u>, *supra*, el voto futuro se anula completamente si mediante el proceso legislativo no se puede derogar la actuación legislativa.**[44] Lo anterior implica que, ante la inexistencia de un remedio legislativo, <u>**corresponde la intervención judicial**</u>.

A modo didáctico, <u>Blumenthal v. Trump</u>, *supra*, repasa la jurisprudencia para recordarnos las instancias en las cuales se considerará que un voto ha sido completamente anulado, cuando: (1) "a bloc of individual state 'legislators whose votes would have been sufficient to defeat (or enact) a specific legislative Act have standing to sue if that legislative action goes into effect (or does not go into effect), on the ground that their votes have been completely nullified.'"[45]; (2) "the legislature, as an institutional plaintiff authorizing the lawsuit, had standing to sue based on the alleged

---

[43] <u>Campbell v. Clinton</u>, 203 F.3d 19, 22-23 (2000).

[44] <u>Raines v. Byrd</u>, *supra*, pág. 824.

[45] <u>Blumenthal v. Trump</u>, 335 F.Supp.3d 45, 58 (2018) citando a <u>Raines v. Byrd</u>, *supra*, pág. 823.

nullification of their votes 'now' or 'in the future' as a result of a ballot initiative".[46]

Asimismo, conforme a las decisiones del Tribunal de Apelaciones para el Circuito del Distrito de Columbia, el caso expone algunas circunstancias que constituyen la anulación de la efectividad del voto que, a su vez, confieren capacidad jurídica a un legislador en su carácter individual, a saber: (1) "treating a vote that did not pass as if it had, or vice versa"[47]; (2) "that a […] vote on a [specific Bill] is a unusual situation" […][with] "no legislative remedy";[48] y finalmente (3)"when it was the [executive branch's] action, rather than "a lack of legislative support," that nullified the Member's vote".[49]

De la tendencia federal notamos que, si el legislador reclama la anulación de la efectividad de su voto, cumple con el *test* y no tiene un remedio legislativo adecuado ni otra persona puede impugnar la actuación legislativa, tiene derecho a presentar la causa de acción, o sea, *standing*.

Ciertamente, es posible armonizar en nuestra jurisdicción los criterios esbozados en la esfera federal

---

[46] Blumenthal v. Trump, *supra*, pág. 58, citando Arizona State Legislature v. Arizona Independent Redistricting Com'n, 135 S.Ct. 2652, 2667 (2015), 576 U. S. ___ (2015).

[47] Campbell v. Clinton, *supra*, pág. 22.

[48] Íd., págs. 22-23.

[49] Chenoweth v. Clinton, 181 F.3d 112, 117 (1999).

al momento de evaluar la capacidad jurídica de un legislador que reclama que la efectividad de su voto ha sido anulada.

En primer lugar, es sabido que un legislador tiene que pasar el crisol de poseer la capacidad jurídica como cualquier ciudadano particular. Segundo, si la parte promovida es un funcionario público, "los tribunales interpretarán los criterios de la legitimación activa de manera flexible y liberal y el análisis de las alegaciones se debe hacer de la manera más favorable y liberal para el promovente del litigio".[50] A su vez, es necesario observar al detalle las particularidades del caso. Tercero, las alegaciones deben incluir lo siguiente: (1) que hubo una votación de un proyecto de ley o resolución conjunta o concurrente o nombramiento específico; (2) que luego de la votación, los votos sean suficientes para aprobar o derrotar la medida, resolución o nombramiento;[51] (3) en la votación, sus votos se consignaron y contabilizaron plenamente; (4) que el proyecto de ley sea aprobado, pero considerado rechazado por el cuerpo legislativo o viceversa; (5) luego de aprobada o derrotada no haya un remedio legislativo que permita derogar la medida, resolución o nombramiento;

---

[50] Bhatia Gautier v. Gobernador, *supra*, págs. 69-70.

[51] Destacamos que, en el contexto de los nombramientos, la votación de éstos dependerá de las exigencias del ordenamiento constitucional o estatutario o si debe ajustarse al reglamento legislativo.

(6) que el resultado de la aprobación o rechazo tuvo el efecto de anular completamente el voto.

Si un legislador cumple con los criterios antes esbozados, tendrá capacidad jurídica para proteger la efectividad de su voto con o sin la concurrencia de otros miembros del cuerpo legislativo que se trate.[52] Resaltamos que, en este tipo de causa de acción, necesariamente el legislador tiene que haber participado del proceso legislativo.

C. El efecto del voto de abstención en el Reglamento de la Cámara de Representantes

Para atender los planteamientos esbozados por las partes, resulta necesario, además, considerar si la causa de acción para reclamar la anulación de la efectividad del voto es de aplicación a los votos de abstención reconocidos en los reglamentos parlamentarios. Así, consientes de nuestra obligación autoimpuesta por el principio de separación de poderes que rige nuestro sistema republicano de Gobierno que, además, nos impone la doctrina de cuestión política, hemos expresado lo siguiente:

> [S]i la Constitución confiere una facultad expresa a una rama de gobierno y ésta es de naturaleza política, la misma no estará sujeta a revisión judicial salvo que dicha facultad sea ejecutada incorrectamente, afectando derechos constitucionales de igual jerarquía. Cuando así suceda, nuestro ordenamiento jurídico no puede evadir la responsabilidad constitucional de interpretar el derecho en casos de conflicto entre las ramas

---

[52] Kennedy v. Sampson, *supra*, pág. 435.

gubernamentales, ya que éstas no pueden convertirse en árbitros de sus propios actos.

Ahora bien, cuando ejercemos la función ineludible e indelegable de interpretar el Derecho en casos de conflictos sobre derechos políticos, así como la constitucionalidad de las fuentes de esos derechos, debemos actuar con mesura, respetando el criterio de otros cuerpos gubernamentales sobre la extensión de sus propios poderes.

Al examinar la validez constitucional de una actuación legislativa impugnada por un legislador hemos expresado que los tribunales son los encargados de "definir [los] contornos [de las facultades del Poder Legislativo y Ejecutivo] y la determinación de la validez de su[s] ejercicio[s] son asuntos cuidadosamente reservados a los tribunales". […] En esa ocasión señalamos que el Poder Judicial es el intérprete final de la Constitución. Haciéndonos eco de las palabras de Alexander Hamilton en *El Federalista*, expresamos que los cuerpos legislativos no pueden ser los jueces constitucionales de sus propios poderes. (Citas omitidas).[53]

En ese contexto, la Sec. 9 del Art. III de nuestra Constitución establece que "cada cámara […]adoptará las reglas propias de cuerpos legislativos para sus procedimientos y gobierno interno" y esta facultad como "corolario del poder inherente para controlar sus procedimientos es de arraigo histórico en nuestra jurisdicción".[54] Sin embargo, podemos atender las reglas legislativas "a tono con la prudencia y mesura que debe existir al revisar un asunto asignado por la Constitución a otra rama de gobierno, la revisión judicial será

---

[53] Noriega Rodríguez v. Jarabo, 136 DPR 497, 516 (1994), Const. ELA, LPRA, Tomo 1, ed. 2016, pág. 402.

[54] Noriega Rodríguez v. Jarabo, *supra*, pág. 517.

admisible sólo si existen criterios judiciales apropiados para resolver la controversia".[55]

En consideración al interés público que representa, resulta necesario repasar nuestras expresiones en torno a las votaciones de los legisladores, según lo expone nuestra Constitución y el Reglamento de la Cámara.

En Noriega Rodríguez v. Jarabo, 136 DPR 497, 517 (1994), atendimos la controversia de si la denegatoria de una abstención de votación y la consecuente ausencia de registro de abstención en el Libro de Actas lesionaron las prerrogativas legislativas de 2 representantes. Este Tribunal resolvió en la negativa. Sin embargo, el caso en sí nos brinda una lección en torno a la responsabilidad de los legisladores de votar y el efecto que tiene el voto de abstención en el proceso legislativo.

Primero, establecimos que los reglamentos de los cuerpos legislativos tienen vigencia limitada y constituyen ley para la Asamblea Legislativa que los aprueba.[56] Además, las normas aplicables o "[l]as fuentes de las reglas del proceso legislativo son las **disposiciones constitucionales o <u>estatutarias</u>, las <u>reglas adoptadas</u> por la propia Asamblea Legislativa**, las **<u>decisiones judiciales</u>**, las fuentes de derecho

---

[55] <u>Noriega Rodríguez v. Jarabo</u>, *supra*, pág. 518.

[56] Íd., pág. 520.

parlamentario, las costumbres, el uso, las órdenes o las resoluciones de la Asamblea".[57]

También, la "interpretación que hace un cuerpo de sus reglas de procedimiento debe ser aceptada por un tribunal a menos que la misma sea claramente errónea". A su vez, reconocimos que la naturaleza de los reglamentos legislativos "son fuente de posibles conflictos entre los miembros de la Asamblea".[58]

Así, el caso nos recalca que por mandato constitucional el quórum de la Cámara de Representantes **"se constituye con veintiséis (26) representantes. [Asimismo], se requieren los votos de veintiséis (26) representantes para lograr una mayoría absoluta para la aprobación de un proyecto de ley, resolución conjunta o concurrente"**.(Énfasis nuestro).[59]

Por último, y en lo concierne a cuál es el efecto de la abstención del voto de un legislador en el trámite parlamentario, concluimos que el voto de abstención afecta el proceso legislativo cerrando la llave de paso y, en consecuencia, no fluye la obra gubernamental o los asuntos de interés público.[60]

Ahora bien, contrario al voto a favor y en contra (que sea expreso), el voto de abstención no es de

---

[57] <u>Noriega Rodríguez v. Jarabo</u>, *supra*, pág. 520.

[58] Íd., pág. 521.

[59] Íd., págs. 528-529.

[60] Íd., pág. 529.

entronque constitucional, sino es "materia regulada por el derecho parlamentario y las reglas internas de cada asamblea".[61] No obstante, esta práctica se ha permitido desde antes de la Convención Constituyente hasta el presente y, por el resultado que podría provocar la abstención del voto, es que se fomenta la participación de los legisladores en el proceso parlamentario.[62] Como veremos más adelante en el Reglamento de la Cámara, *infra*, las regulaciones al voto de abstención no ha cambiado.

En el presente caso no se cuestiona la constitucionalidad de una regla, sin embargo, ante la interpretación errónea de una norma legislativa, estamos facultados para intervenir. Veamos las disposiciones del Reglamento de la Cámara de Representantes de Puerto Rico, R. de la C. 126, Decimoséptima Asamblea Legislativa, 15 de enero de 2013, (Reglamento de la Cámara) que gobiernan o inciden en la votación, la abstención del voto y la reconsideración.

De entrada, en lo concerniente al voto del legislador, hemos expresado lo siguiente:

> [L]a Constitución expresa que "[l]as Cámaras llevarán libros de actas donde harán constar lo relativo al trámite de los proyectos y las votaciones emitidas a favor y en contra de los mismos". Art. III, Sec. 17, Const. E.L.A., *supra*, ed. 1982, pág. 344. Además, señala que

---

[61] Noriega Rodríguez v. Jarabo, *supra*, pág. 532.

[62] Íd., pág. 526, Art. III, Sec. 17, Const. ELA, LPRA, Tomo 1, ed. 2016, págs.410-411.

los proyectos de ley deberán ser aprobados por una mayoría total de los miembros de cada Cámara y que "[t]oda aprobación final o reconsideración de un proyecto será en votación por lista". Art. III, Sec. 19, Const. E.L.A., *supra*, ed. 1982, pág. 346.[63]

Este deber de la Asamblea Legislativa contenido en la Sección 36 del Reglamento de la Cámara, *supra*, está relacionado con el calendario de aprobaciones finales. Mediante la Sección 36.3 del Reglamento de la Cámara, *supra*, se establece la votación para la aprobación final de una pieza legislativa o resolución conjunta o concurrente.

**Sección 36.3.-Votación**

La votación para la aprobación final de cualquier proyecto de ley o resolución conjunta o concurrente **se llevará a efecto por lista** o **por votación electrónica** y el resultado será anotado en el Acta. **Ningún proyecto de ley o resolución será aprobado a menos que una <u>mayoría absoluta</u> de los miembros de la Cámara vote a favor de la aprobación de la misma.** (Énfasis nuestro).[64]

En cuanto a la votación por lista, el Reglamento de la Cámara, *supra*, establece lo siguiente:

**Sección 37.4.-Votación Electrónica o Votación por lista**

.   .   .   .   .   .   .

**Para los fines de cualquier disposición legal que contemple una votación por lista, la votación electrónica certificada surtirá el mismo efecto.** (Énfasis nuestro).[65]

---

[63] <u>Noriega Rodríguez v. Jarabo</u>, *supra*, págs. 530-531.

[64] Reglamento de la Cámara de Representantes de Puerto Rico, R. de la C. 126, Decimoséptima Asamblea Legislativa, 15 de enero de 2013, (Reglamento de la Cámara), pág. 124.

[65] Íd.,págs. 125-126.

Es importante resaltar que "la votación por lista es un medio de fijar la responsabilidad individual por la aprobación o rechazo de una medida".[66]

Por otro lado, la Sección 37.5 del Reglamento de la Cámara, *supra*, rige los asuntos de los votos de abstención y, en lo pertinente, dispone lo siguiente:

> **Sección 37.5.-Participación en las votaciones; abstenciones**
>
> Los Representantes presentes al momento de efectuarse una votación por lista o electrónica vendrán obligados a emitir su voto, excepto en los casos que a continuación se indican:
>
> .   .   .   .   .   .   .   .
>
> **(c) los Representantes podrán abstenerse de votar con el consentimiento de la mayoría presente cuando no estén preparados para emitir su voto por desconocimiento del asunto sometido a votación.**
>
> En todos aquellos casos en que un Representante solicite que se le permita abstenerse de votar, el asunto se resolverá sin debate.
>
> **En caso de autorizarse la abstención, el Presidente ordenará al Secretario que permita al Representante abstenerse en el Sistema Electrónico de Votación.** Si la decisión de la Cámara fuere en la negativa, el Representante que solicitó la abstención vendrá obligado a emitir su voto.
>
> **En el caso de una votación por lista, si al ser llamado a emitir su voto y estando en sala, el Representante se negara a votar, o votare abstenido habiendo sido denegada su petición o no habiendo solicitado la abstención se entenderá que está votando en contra y así se consignará en la hoja de votación.** (Énfasis nuestro)[67]

---

[66] <u>Noriega Rodríguez v. Jarabo</u>, *supra*, pág. 531, esc.56.

[67] Reglamento de la Cámara, *supra*, págs. 126-127.

Resaltamos que, según nuestra Opinión en <u>Noriega Rodríguez v. Jarabo</u>, *supra*, un voto de abstención puede constituir un obstáculo cuando no se logra la mayoría absoluta de los miembros que componen el cuerpo. Por lo tanto, la consecuencia de la autorización del voto de abstención es que se tiene que consignar para determinar si la pieza legislativa o la resolución o el nombramiento que exija la mayoría absoluta contó con los votos necesarios. **Es decir, el voto de abstención autorizado por el cuerpo legislativo es como voto en contra *de facto, no de jure.*** Lo anterior es porque, según la precitada sección del Reglamento de la Cámara, *supra*, si al llamar a un representante a la votación por lista y se encuentre en sala, pero: (1) se niega a votar; (2) se abstiene de votar, sin autorización para hacerlo; o (3) se abstiene de votar, luego de denegada su solicitud se entenderá que votó en contra y así se consignará en la hoja de votación.

En cuanto al asunto del trámite de reconsideración, éste es gobernado por la Sección 39 del Reglamento de la Cámara, *supra*. En específico, la Sección 39.3 del Reglamento de la Cámara, *supra*, dispone el procedimiento de la solicitud de reconsideración y quiénes pueden peticionarla cuando la votación es por lista. La disposición establece lo siguiente:

**Sección 39.3.-Reconsideración en votación por lista o electrónica**

.   .   .   .   .   .   .   .

**Cuando una votación se hubiere llevado a cabo por lista o electrónica, <u>solamente</u> podrá solicitar la reconsideración de la medida legislativa o asunto votado cualquier representante que, mediante su voto, <u>fuere parte del grupo que obtuvo la mayoría en esa votación</u>.** (Énfasis nuestro).[68]

Nótese que cuando la votación es por lista o electrónica, solamente los legisladores que fueron parte del grupo que obtuvo la mayoría de los votos podrá solicitar la reconsideración. De lo contrario, no podrá solicitar la reconsideración del asunto votado.

D.   El caso Acevedo Vilá v. Meléndez

De entrada, esta situación en particular nos lleva a evaluar el planteamiento de la recurrida y la decisión de los foros recurridos de que, conforme a <u>Acevedo Vilá v. Meléndez</u>, 164 DPR 875 (2005), los legisladores carecían de *standing* para presentar la causa de acción. Veamos los hechos del caso.

El Hon. Aníbal Acevedo Vilá, Gobernador de Puerto Rico (Gobernador), envió al Senado el nombramiento de la Sra. Marisara Pont Marchese (señora Pont Marchese) para ocupar el puesto de Secretaria de Estado. Luego de contar con el aval del Senado -de 26 votos a favor y 1 en contra- el nombramiento de la señora Pont Marchese pasó ante la consideración de la Cámara. La primera votación se celebró a viva voz. No obstante, el representante Hon. Víctor García

---

[68] Reglamento de la Cámara, *supra*, págs. 130-131.

San Inocencio notificó que la votación tenía que ser por lista. El portavoz de la minoría, el representante Hon. Héctor Ferrer Ríos (representante Ferrer Ríos), secundó la petición por ser cónsona con el Reglamento de la Cámara al disponer que los nombramientos se consideraban mediante votación por lista. El resultado de la votación por lista reflejó que la nominada obtuvo 24 votos a favor y 16 en contra. A raíz del resultado, el entonces Presidente de la Cámara, Hon. José Aponte Hernández, declaró que el nombramiento de la señora Pont Marchese no contó con el respaldo de la **mayoría absoluta** del Cuerpo. Luego de que el representante Ferrer Ríos alegó que para la aprobación se requería una **mayoría simple**, el Presidente de la Cámara mantuvo su determinación de que la señora Pont Marchese no fue confirmada.

El representante Hon. Luis Pérez Ortiz, quien había votado a favor de la nominada, solicitó la reconsideración de la votación junto con otros 5 representantes. En la votación de la reconsideración, la nominada obtuvo 20 votos a favor y 22 en contra, por lo que el Presidente de la Cámara pronunció que la nominada no había sido confirmada. A raíz de la votación, se emitió la certificación para notificarle al Gobernador que su nominada no resultó favorecida.

Por estos hechos, el representante Ferrer Ríos, el Gobernador y la señora Pont Marchese presentaron un auto de *Mandamus* para ordenar la validez de la votación por lista

inicial, porque la votación en reconsideración era errada, y, además, solicitó la expedición de la certificación confirmando el nombramiento de la nominada.

Evaluada la controversia, este Tribunal determinó que los demandantes no tenían legitimación activa. Al evaluar los hechos nos percatamos que: (1) era un auto de *Mandamus*;[69] (2) el representante Ferrer Ríos votó a favor del nombramiento de la señora Pont Marchese; (3) debido a que votó a favor y era parte del voto mayoritario simple, tuvo el beneficio de la reconsideración solicitada por otro representante; (4) se consignaron los votos -el inicial y el de reconsideración- del representante Ferrer Ríos; y (5) ante la falta de comparecencia de 2 representantes, este Tribunal no pudo considerar el planteamiento del representante Ferrer Ríos en torno al cómputo de los votos emitidos por error en la reconsideración del nombramiento.

Aun si consideramos el caso dentro del contexto de Raines v. Byrd, *supra*, el representante Ferrer Ríos no tenía legitimación activa. El representante Ferrer Ríos votó a favor de la nominada y, en consecuencia, gozó de remedios legislativos, entre estos, la reconsideración. Asimismo, el representante Ferrer Ríos sí alegó que votó por un nombramiento específico y que la votación final era suficiente para la confirmación, pero la realidad es que la nominada no obtuvo los votos necesarios para la aprobación

---

[69] Según expresamos en Acevedo Vilá v. Meléndez, *supra*, págs. 906-907, el auto de *Mandamus* era improcedente. Es decir, no era el recurso adecuado.

del nombramiento en la reconsideración concedida, conforme disponía el reglamento del cuerpo legislativo. Es decir, "they simply lost that vote"[70] y mediante un recurso de *Mandamus* pretendió trasladar el debate legislativo al foro judicial.

Cabe apuntar que al discutir la capacidad jurídica de la señora Pont Marchese, expresamos lo siguiente:

> [L]a Sra. Marisara Pont Marchese no ha expuesto un daño claro y palpable más allá de la pérdida de su expectativa y de su deseo de servir a Puerto Rico como la Secretaria del Departamento de Estado. Independientemente de los méritos de su nominación por el Gobernador, la señora Pont Marchese no tiene un derecho sobre dicho cargo precisamente porque **no ha sido confirmada por ambas cámaras**, según lo requiere el Art. IV, Sec. 5 de nuestra Constitución, *supra*. **Tampoco se han expedido las correspondientes credenciales ni ha prestado su juramento una vez nombrada**, como ocurrió en el caso *United States v. Smith*, 286 U.S. 6 (1932). En vista de ello, este Tribunal no puede confeccionar un remedio judicial que no conlleve una intromisión indebida en el poder legislativo. (Énfasis nuestro).[71]

Con estas expresiones descartamos el planteamiento de la recurrida de que los legisladores incumplieron con el requisito de legitimación pasiva al señalar que no se nominó para el cargo ni participó en la votación que, según alegó, la favoreció en la confirmación del nombramiento. Contrario a lo aseverado, la recurrida era la razón por la cual se llevó a cabo el procedimiento legislativo.

---

[70] <u>Raines v. Byrd</u>, *supra*, pág. 824.

[71] <u>Acevedo Vilá v. Meléndez</u>, *supra*, pág. 888.

Por último, para poder disponer de la presente controversia es necesario revisar el Art. 10 de la Ley Núm. 2 de 23 de febrero de 1988, según enmendada, conocida como la Ley para Crear la Oficina del Panel sobre el Fiscal Especial Independiente (Ley del Panel del FEI), 3 LPRA sec. 99(h) *et seq.*, que, según los peticionarios, surgía la obligación de impartir el consejo y consentimiento conforme a la mayoría absoluta que componen el Cuerpo y no por el voto de la mayoría simple que resultó en la confirmación del nombramiento.

E.   La Ley del Panel del FEI

El Art. 10 de la Ley del FEI, *supra*, regula la designación de los miembros en propiedad y los alternos del Panel sobre el Fiscal Especial y, en lo pertinente, establece lo siguiente:

> El Gobernador de Puerto Rico designará, con el **consejo y consentimiento de la <u>mayoría del número total de los miembros que componen</u> el Senado y la Cámara de Representantes de Puerto Rico**, tres miembros en propiedad con experiencia en el campo de derecho penal. Estos tres (3) miembros constituirán el Panel y serán seleccionados de entre los ex jueces del Tribunal Supremo, del Tribunal de Apelaciones, o del Tribunal de Primera Instancia. **<u>El Gobernador de Puerto Rico también designará, de la misma forma</u>**, de entre los ex jueces del Tribunal Supremo, del Tribunal de Apelaciones o del Tribunal de Primera Instancia **<u>dos (2) miembros alternos que formarán parte del Panel</u>** en caso de inhibición o de alguna otra circunstancia que impida a cualquier miembro en propiedad desempeñar sus funciones.[…]. (Énfasis nuestro). [72]

---

[72] 3 LPRA sec. 99(q).

Asimismo, el nombramiento del miembro en propiedad y del miembro alterno tienen un término de 10 años que "se computará a partir de la fecha en que éstos prestaron su juramento, una vez confirmados por el Senado y la Cámara de Representantes".[73]

Como ya hemos mencionado, si no se activa la disposición constitucional sobre la representación de los partidos de minoría, **"el quórum del Cuerpo se constituye con veintiséis (26) representantes. [Asimismo], se requieren los votos de veintiséis (26) representantes para lograr una mayoría absoluta para la aprobación de un proyecto de ley, resolución conjunta o concurrente"** [74].

Según la legislación, esa es la cantidad de votos que se requiere tanto para el nombramiento de un miembro en propiedad como para un miembro alterno del Panel del FEI.

IV

Luego del análisis esbozado, debemos cuestionarnos si la acción de la Cámara de confirmar el nombramiento de la nominada anuló la efectividad o el valor del voto de abstención de los peticionarios. Contestamos en la afirmativa.

En esencia, los peticionarios procuran reivindicar el valor del voto de abstención y así defender su interés individual vinculado al proceso legislativo. Esgrimen que el caso no se trata del poder inherente asignado a la Asamblea

---

[73] 3 LPRA sec. 99(q).

[74] Noriega Rodríguez v. Jarabo, *supra*, págs. 528-529.

Legislativa, sino del cumplimiento de una disposición estatutaria en la que la Rama Legislativa estableció la manera en que ésta prestaría su consejo y consentimiento para el nombramiento que la Rama Ejecutiva propuso al cargo del miembro alterno del Panel del FEI.

Por otro lado, el argumento central de la recurrida es que los peticionarios participaron del proceso legislativo, se abstuvieron de votar, se consignaron sus votos y el nombramiento se celebró conforme lo dispone el Reglamento de la Cámara, *supra*, según lo interpretó el Presidente Incidental de la Decimoséptima Asamblea Legislativa. Por tal motivo, reitera que los peticionarios carecen de legitimación activa porque no se menoscabó la prerrogativa legislativa que poseen.

Las particularidades del presente caso se distinguen de <u>Acevedo Vilá v. Meléndez</u>, *supra*. Analicemos el *test* de <u>Raines v. Byrd</u>, *supra*, para demostrar si la actuación de la Cámara anuló la efectividad o valor del voto de abstención de los peticionarios.

En el presente caso, los peticionarios alegaron que la Cámara tenía ante su consideración el nombramiento de la recurrida como miembro alterno del Panel del FEI. Éstos, afirmaron que, luego de que el portavoz de la minoría explicara las razones por las cuales su grupo se abstendría de votar, la Cámara les permitió consignar la abstención de la votación.

Como mencionáramos, la votación final del nombramiento de la recurrida resultó en 24 votos a favor, 0 en contra, 14 abstenidos y 13 ausentes. Conforme a la precitada legislación, la designación de la recurrida como miembro alterno del Panel del FEI requiere el consentimiento de la mayoría absoluta de ambos cuerpos legislativos. **Es decir, el quórum exigido para la confirmación del cargo era de 26 votos a favor.** No obstante, la Cámara no consideró que las disposiciones estatutarias, las reglas que adopta y la jurisprudencia de este Tribunal son algunas de las normas aplicables o "[l]as fuentes de las reglas del proceso legislativo".[75] O sea, la Casa de las Leyes tiene que cumplir con la legislación que aprueba, el reglamento que promulga y acatar las decisiones que tomamos.

Ahora bien, indistintamente de que el voto de abstención no es de entronque constitucional, su reconocimiento en el Reglamento de la Cámara, *supra*, le extiende un carácter estatuario, pues los reglamentos de los cuerpos legislativos constituyen ley para la Asamblea Legislativa que los aprueba.[76] Además, es una realidad que ante un mandato legislativo que requiere que se apruebe un nombramiento por mayoría absoluta, un voto de abstención tiene el efecto de constituir un voto menos de los requeridos por ley para alcanzar el mínimo necesario para que el nombramiento sea válido.

---

[75] *Noriega Rodríguez v. Jarabo*, *supra*, pág. 520.

[76] Íd.

Por otro lado, tal como expresamos en el pasado y hoy reiteramos, el voto de abstención en una votación que requiera la mayoría absoluta podría cerrar la llave de paso del asunto de interés público considerado por el cuerpo legislativo. En este caso, el nombramiento de la recurrida.

Una vez permitida la abstención del voto por la Cámara, tiene que surtir efecto si, como en este caso, la votación final del nombramiento de la recurrida no logró alcanzar la mayoría absoluta que requiere la Ley del Panel del FEI. Por ello, no hay duda de que, según alegaron los peticionarios, los votos fueron suficientes para rechazar el nombramiento confirmado por la Cámara.

Finalmente, para determinar si a los peticionarios les anularon la efectividad del voto, además, debemos contestar la siguiente interrogante: los peticionarios, ¿tenían un remedio legislativo adecuado?

Conforme a la Sección 39.3 del Reglamento de la Cámara, *supra*, solo aquellos que fueron parte del grupo de legisladores que obtuvieron la mayoría de los votos podían solicitar la reconsideración de la votación final. Al consignarse el voto de abstención de los peticionarios y éstos no ser parte del grupo que votó con la mayoría, estaban impedidos de solicitar la reconsideración de la votación final.

Además de lo anterior, por la naturaleza inusual del nombramiento no es posible revertirlo mediante un trámite legislativo posterior, sino que, para ello, es necesario

solicitar la intervención judicial. Inusual, porque el nombramiento de un miembro del Panel del FEI tiene un término de 10 años, computado desde que es confirmado por la Rama Legislativa. Por lo tanto, correspondía la intervención judicial.

Así las cosas, resolvemos que **la confirmación del nombramiento de la recurrida por parte de la Cámara sin contar con los votos suficientes provocó la anulación de la efectividad del voto de abstención de los peticionarios**, y ante la ausencia de remedio legislativo disponible, la acción del cuerpo legislativo constituyó un daño concreto y directo al palio del Art. 10 de la Ley del Panel del FEI, *supra*, y del Reglamento de la Cámara, *supra*.

Por lo tanto, contrario a lo resuelto por los tribunales de menor jerarquía, los peticionarios poseen legitimación activa en su carácter individual para presentar la causa de acción por la anulación de la efectividad o valor del voto.

V

Por los fundamentos antes expuestos, se revoca al Tribunal de Apelaciones y se devuelve el caso al Tribunal de Primera Instancia para que atienda el caso conforme a lo aquí resuelto.

Se dictará sentencia de conformidad.

Erick V. Kolthoff Caraballo
Juez Asociado

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Honorable María de Lourdes
Ramos Rivera, por sí y como
Vicepresidenta de la Cámara de
Representantes de Puerto Rico y
el Honorable Carlos Méndez Núñez,
por sí y como Presidente de la
Cámara de Representantes de
Puerto Rico                          CC-2018-197      Certiorari

      Peticionarios

        v.

Licenciada Emmalind García García

      Recurrida


SENTENCIA

En San Juan, Puerto Rico, a 27 de septiembre de 2019.

Por los fundamentos expuestos en la Opinión que antecede la cual se hace formar parte íntegra de la presente, se revoca al Tribunal de Apelaciones y se devuelve el caso al Tribunal de Primera Instancia para que atienda el caso conforme a lo aquí resuelto.

Así lo pronunció, manda el Tribunal y certifica el Secretario del Tribunal Supremo. La Juez Asociada señora Rodríguez Rodríguez y el Juez Asociado señor Colón Pérez emitieron Opiniones disidentes. La Jueza Presidenta Oronoz Rodríguez no interviene.


José Ignacio Campos Pérez
Secretario del Tribunal Supremo

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Hon. María de Lourdes Ramos Rivera, por sí y como Vicepresidenta de la Cámara de Representantes de Puerto Rico y el Hon. Carlos Méndez Núñez, por sí y como Presidente de la Cámara de Representantes de Puerto Rico<br><br>Peticionarios<br><br>v.<br><br>Lcda. Emmalind García García<br><br>Recurrida | **Núm.** CC-2018-0197 |

Opinión disidente emitida por la Juez Asociada señora Rodríguez Rodríguez

San Juan, Puerto Rico, a 27 de septiembre de 2019

> "I can believe anything, provided that it is quite incredible"
> -Oscar Wilde

La Opinión que hoy suscribe una mayoría es abiertamente inconsistente con los dictámenes recientes de esa misma mayoría relacionados con la doctrina de legitimación activa. ¿A qué obedece este zigzagueante estándar? ¿Deriva de la naturaleza del reclamo presentado o de una consideración templada de la identidad de los sujetos que lo realizan y su cumplimiento con los requisitos que la doctrina exige? Es incuestionable que el dictamen que hoy se emite propende al desarrollo de una normativa ininteligible que aun a la propia

mayoría se le dificulta aplicar. Por entender que el concepto de legitimación activa alude a la capacidad de un reclamante de ejercitar un derecho y su análisis necesariamente ha de enfilarse en la titularidad del interés reclamado, disiento del dictamen que hoy emite este Tribunal.

En esencia, la controversia planteada requería determinar si dos legisladores ostentan legitimación activa para impugnar la confirmación de una nominada a un puesto gubernamental por parte de la Cámara de Representantes. Ello, luego de que ambos se abstuvieron de emitir un voto a favor o en contra de la nominada. En otras palabras, a pesar de haber participado plenamente en el proceso legislativo de confirmación y de haber tenido la oportunidad de emitir sus respectivos votos, los dos legisladores recurrieron a los foros judiciales para solicitar, mediante una demanda de *injunction* y sentencia declaratoria, que se declarara ilegal el nombramiento. Por entender que los foros recurridos actuaron correctamente al determinar que estos legisladores carecían de legitimación activa, disiento de la Opinión que hoy suscribe una mayoría. No albergo duda de que los legisladores a quienes una mayoría hoy les reconoce legitimación activa fundamentaron su reclamo en un daño puramente imaginativo e hipotético basado en supuestos y conjeturas altamente improbables.

I.

Los hechos que originan la controversia ante nuestra consideración se consignan en la Opinión mayoritaria, por lo que limito mi exposición a lo fundamental. El 27 de diciembre de 2016, la Cámara de Representantes de la Decimoséptima Asamblea Legislativa declaró aprobada la nominación de la Lcda. Emmalind García García como Miembro Alterno del Panel sobre el Fiscal Especial Independiente. A esos efectos, el 28 de diciembre de 2016, la secretaria de la Cámara de Representantes envió una carta al entonces Gobernador, Hon. Alejandro García Padilla, informándole que ese cuerpo legislativo había considerado y había dado su consentimiento a la nominación. Véase Ap., en la pág. 73. Ese mismo día, el secretario del Senado también envió una carta al Gobernador informándole la confirmación de la licenciada García García al cargo por parte del Senado. *Id.* en la pág. 47. Contando con el consejo y consentimiento de ambas cámaras legislativas, el 3 de enero de 2017, la licenciada García García juramentó como Miembro Alterno del Panel del Fiscal Independiente y tomó posesión del cargo. *Id.* en la pág. 75.

El 20 de enero de 2017, el Hon. Carlos Méndez Núñez y la Hon. María de Lourdes Ramos Rivera, Presidente y Vicepresidenta de la Cámara de Representantes de la Decimoctava Asamblea Legislativa, respectivamente, presentaron una demanda sobre sentencia declaratoria e *injunction* en

contra de la licenciada García García. En ésta, alegaron que comparecían "por sí" y -en el caso del representante Méndez Núñez- en calidad de Presidente de la Cámara de Representantes. Mediante la demanda, solicitaron que se decretara la nulidad del nombramiento de la licenciada García García, en tanto y cuanto ésta no obtuvo los votos necesarios para ser confirmada. Específicamente, sostuvieron que el Art. 10 de la Ley del Fiscal Especial Independiente, Ley Núm. 2 de 23 de febrero de 1988, 3 LPRA sec. 99q, requería 26 votos a favor y que la letrada solamente había obtenido 24. Ello, dado que hubo 14 representantes abstenidos y 13 ausentes, si bien ninguno votó en contra de la nominada.

El 6 de febrero de 2017, la licenciada García García presentó una *Moción de Desestimación* en la que arguyó que los representantes Méndez Núñez y Ramos Rivera carecían de legitimación activa para impugnar su nombramiento como legisladores y en representación de la extinta Cámara de Representantes de la Decimoséptima Asamblea Legislativa. Adujo, además, que los legisladores se habían abstenido de votar y que no habían alegado un daño real y palpable como consecuencia de su nombramiento. Los legisladores, por su parte, se opusieron a la desestimación de la demanda planteando que tenían un "interés legítimo en que sus votos no sean anulados ni su participación en el proceso menoscabado". Sostuvieron que la confirmación que pretendían impugnar había

tenido el efecto de anular los votos de aquellos legisladores que no votaron a favor del nombramiento.

Tanto el Tribunal de Primera Instancia como el Tribunal de Apelaciones concluyeron que, en efecto, los legisladores carecían de legitimación activa para incoar la demanda solicitando la nulidad del nombramiento. Ello, puesto que, al abstenerse de votar, ejercieron sus prerrogativas legislativas y no surgía que se le hubiese afectado su participación plena en los procesos. Asimismo, ambos foros concluyeron que los legisladores carecían de legitimación activa para comparecer en representación de una Cámara de Representantes cuyas funciones cesaron en el año 2016. Determinaron, además, que los legisladores no habían demostrado cómo la confirmación de la licenciada García García les había causado un daño claro, real y palpable o les había lesionado sus derechos y prerrogativas legislativas durante el proceso. Por último, el Tribunal de Apelaciones destacó que el argumento de los legisladores en torno a cómo su legitimación se fundamentaba en que estaban sujetos a la jurisdicción investigativa y acusatoria del Panel era uno frívolo que descansaba en la suposición -altamente especulativa- de que alguno de ellos pudiese ser objeto de alguna investigación en la que la licenciada García García participara por razón de la no intervención de algún miembro en propiedad.

Insatisfechos, los legisladores recurrieron ante este Tribunal e insistieron en que poseían legitimación para

impugnar el nombramiento de la licenciada García García por sí y en representación de la Cámara de Representantes. Con la Opinión que se emite durante el día de hoy, una mayoría de este Tribunal les da la razón y devuelve el caso al Tribunal de Primera Instancia para que adjudique los méritos sustantivos de su reclamo. Tal y como discuto a continuación, ese proceder se desentiende de los requisitos concernientes a la doctrina de legitimación activa y es contrario a la jurisprudencia de este Tribunal relacionada con la aplicación de esa doctrina a los legisladores.

## II.

Recientemente, este Tribunal dictaminó que un legislador posee legitimación activa cuando procura vindicar un interés personal en el ejercicio pleno de sus funciones legislativas, según éstas se ven afectadas por actuaciones de la Rama Ejecutiva. Solo entonces el legislador estará en posición de demostrar a los tribunales que sus derechos constitucionales o estatutarios han sido vulnerados. *Véase Bhatia Gautier v. Gobernador*, 199 DPR 59 (2017). Es por ello que, tal y como reiteramos hace apenas un mes, al incoar un reclamo judicial, los legisladores no están exentos de cumplir con los criterios de legitimación activa, "a saber, la existencia de un daño claro y real, no imaginario o hipotético". *Senado de Puerto Rico v. Gobierno de Puerto Rico*, 2019 TSPR 138 (2019).

Al aplicar la doctrina de legitimación activa a legisladores, en *Noriega v. Hernández Colón*, 135 DPR 406 (1994) resolvimos que un legislador no tenía legitimación activa para impugnar la aprobación de unas medidas legislativas porque no se había opuesto a ellas durante el trámite legislativo. En este caso, como se indicó, ninguno de los dos legisladores que comparecieron como demandantes ante el Tribunal de Primera Instancia votó en contra del nombramiento de la licenciada García García. *Noriega*, *supra*, sería suficiente para rechazar los reclamos de los peticionarios. Se pretende, sin embargo, equiparar su abstención de emitir un voto durante el proceso legislativo con un voto en contra de la licenciada García García. Este razonamiento tautológico es propio de la nigromancia, mas no de la argumentación jurídica.

Curiosamente, los legisladores en este caso sostienen que "tienen un interés legítimo por que sus votos no sean anulados o su participación en el proceso menoscabada". La lógica dicta que solamente un voto en contra tiene el efecto de anular un voto a favor. La mayoría, sin embargo, en un claro desafío a esa lógica, concluye que "la acción de la Cámara de Representantes de confirmar el nombramiento de la nominada anuló el valor del voto de abstención de los peticionarios". *Ponencia* en la pág. 44. Distinto a esta conclusión, y conforme a lo resuelto en *Noriega*, *supra*, los legisladores en este caso carecen de legitimación activa para impugnar una actuación

legislativa a la cual **no se opusieron**. Dado que activamente se negaron a votar a favor o en contra de la nominada, resulta un oxímoron denominar su abstención como un voto.[77]

Al equiparar su abstención con el acto afirmativo de votarle en contra a un nombramiento del Ejecutivo, los legisladores pretenden -por la vía judicial- tener una segunda oportunidad de intervenir en un proceso en el que ya participaron y para el cual su posición no prevaleció. En otras palabras, procuran "trasladar el debate legislativo de la arena política al foro judicial"; proceder que este Tribunal censuró enérgicamente en *Hernández Torres v. Gobernador I*, 129 DPR 824, 842 (1992). Lo que es peor, ese traslado se da en virtud de una renuencia afirmativa por parte de los legisladores que comparecen ante este Tribunal de incidir activamente en el resultado de ese debate mediante la emisión de un voto cuantificable a favor o en contra del nombramiento. Como ya indicamos, debido a que los legisladores **no se opusieron** al nombramiento de la licenciada García García durante el transcurso del debate legislativo,

---

[77] "En la figura que se llama oxímoron, se aplica a una palabra un epíteto que parece contradecirla; así los gnósticos hablaron de luz oscura, los alquimistas, de un sol negro." Jorge Luis Borges, El Zahir en *El Aleph*, en la pág. 42 (Alianza Editorial 1997). *Véase además*, Henry M. Robert III et al., *Robert's Rules of Order,* Frequently Asked Questions, *disponible en* http://www.robertsrules.com/faq.html#6 ("The phrase 'abstention votes' is an oxymoron, an abstention being a refusal to vote. To abstain means to refrain from voting, and, as a consequence, there can be no such thing as an 'abstention vote.'").

están impedidos de impugnar el resultado de éste ante un foro judicial. Eso fue justamente lo que este Tribunal dictaminó en *Noriega*, *supra*.

Resulta inconcebible que una mayoría entienda que el efecto de la abstención de los legisladores en este caso fue anular "el valor" de los votos que conscientemente se negaron a emitir. Incontrovertiblemente, los legisladores a quienes este Tribunal les permite un segundo turno al bate con la Opinión que antecede estuvieron presentes en el debate legislativo, no fueron excluidos de éste, tuvieron amplia oportunidad de participar y votar a favor o en contra del nombramiento. No obstante, decidieron -consciente y afirmativamente- abstenerse del ejercicio de sus deberes y funciones como integrantes de la Cámara de Representantes. Contrario a lo que hace la mayoría, me resulta imposible atribuirle valor alguno a ese proceder, mucho menos cuando ello conlleva soslayar el principio de separación de poderes y desvirtuar por completo la doctrina de legitimación activa.[78]

---

[78] Del expediente surge que los legisladores ni tan siquiera alertaron al cuerpo legislativo sobre la supuesta "anulación del valor de sus votos". Por el contrario, optaron por observar -pasivamente y sin oposición- cómo el Presidente incidental de la Cámara determinó que el nombramiento había sido confirmado, cómo se le envió la certificación a esos efectos al Gobernador y cómo la licenciada García García juramentó a su cargo. Incluso, esperaron a que culminara la decimoséptima Asamblea Legislativa, foro ante el cual se dio el debate durante el cual se abstuvieron de votar. Luego de tanta inercia, decidieron acudir a los tribunales a reclamar la presunta ilegalidad de la actuación de una cámara legislativa que ya no está en funciones y de un gobernador cuyo mandato culminó.

Tal y como se destaca en la Opinión mayoritaria, al oponerse a la solicitud de desestimación por falta de legitimación activa presentada por la recurrida, los legisladores plantearon que gozaban de "un interés legítimo de que sus votos no sean anulados ni su participación en el proceso de confirmación sea menoscabada". *Opinión*, en la pág. 8. A lo largo de la ponencia, al exponer y evaluar los argumentos de los peticionarios, la mayoría continúa refiriéndose al interés legítimo de éstos de que sus votos no sean anulados "completamente". A todas luces, pues, a la propia mayoría se le dificulta discernir las implicaciones de una abstención en un proceso legislativo. Así, al resumir los argumentos de los peticionarios, la mayoría continúa refiriéndose al interés legítimo de éstos de que sus "votos" no sean anulados "completamente".

Al margen del significado que la mayoría y los legisladores aquí peticionarios le atribuyan al adverbio "completamente" en este contexto, la realidad inescapable es que los legisladores peticionarios **no votaron ni a favor ni en contra** del nombramiento de la licenciada García García. A pesar de que un acto que nunca se concretó no puede ser objeto de una anulación -**completa o parcial**- la mayoría recurre a la doctrina de *vote nullification* para investir indebidamente a los legisladores de legitimación activa. La mayoría incluso reformula la controversia y se refiere a la causa de acción de impugnación del nombramiento de la licenciada García García

como "una causa de acción sobre anulación del valor o efectividad del voto de un legislador". *Opinión* en la pág. 1.[79]

La propia Opinión suscrita por la mayoría revela una cándida confusión y ambivalencia en torno al efecto de la abstención de los legisladores peticionarios. Por un lado, en la Opinión se afirma que "el voto de abstención autorizado por el cuerpo legislativo es como (sic.) voto en contra *de facto*, no *de jure*". *Id.* en la pág. 38. No obstante, al concluir la ponencia se establece que "la confirmación del nombramiento de la recurrida por parte de la cámara sin contar con los votos suficientes provocó la anulación de la efectividad del voto de abstención de los peticionarios". *Id.* en la pág. 48.

Este difuso y enrevesado análisis plantea serias interrogantes: ¿un "voto en contra *de facto*" tiene una efectividad distinta a la de un voto en contra, sin más? Si la mayoría en realidad considera que un "voto de abstención" autorizado es -para todos los efectos- un voto en contra, ¿por qué recurrir a la doctrina de vote *nullification*? No queda claro entonces cuáles fueron los votos nulificados: ¿los votos

---

[79] Por más que la mayoría intente fungir como la representación legal de los legisladores peticionarios, hasta el punto de reformular la controversia, del expediente surge claramente que en la demanda que éstos presentaron ante el Tribunal de Primera Instancia solicitaron que se declarara "ilegal y ultra vires" el nombramiento de la licenciada García García mediante el mecanismo de sentencia declaratoria. *Véase Ap.* en la pág. 21, *Demanda Jurada de 19 de enero de 2017*. Fundamentaron su legitimación activa en "que se encuentran sujetos a la jurisdicción investigativa y acusatoria de miembros del Panel del FEI que pretenden ostentar sus cargos de manera ilegal". *Id.*

en contra *de facto* o los votos de abstención que son votos en contra *de facto*? ¿No son lo mismo? ¿Puede anularse un acto que nunca ocurrió? Si en efecto una abstención autorizada tiene el mismo efecto de un voto en contra ¿no era más fácil resolver la controversia cuantificando las abstenciones como votos en contra? Tal y como se adelantó, el razonamiento de la mayoría no es más que un oxímoron, pues una abstención autorizada consiste en rehusarse a emitir un voto y es imposible atribuirle a ese acto afirmativo de no votar un valor cualitativo que no tiene, el de un voto emitido. En otras palabras, por arte de magia esa decisión consciente de no votar se trasmuta en un voto.

Además de escudriñar exhaustivamente jurisprudencia federal relacionada con la doctrina de *vote nullification*, la mayoría hace un esfuerzo –poco convincente, pero que honra a Gordias dicho sea de paso- por conciliar su determinación con lo resuelto por este Tribunal en *Acevedo Vilá v. Meléndez*, 164 DPR 875 (2005). En *Acevedo Vilá* se concluyó que un legislador **no tiene legitimación activa para impugnar el resultado certificado por la Cámara de Representantes salvo que demuestre que durante el proceso legislativo se le violó alguna prerrogativa o derecho como legislador.** *Acevedo Vilá*, 164 DPR en las págs. 887-88. A grandes rasgos, y en lo pertinente al caso ante nuestra consideración, en *Acevedo Vilá*, *supra,* un legislador que había votado a favor de la confirmación de una nominada cuestionó la certificación de la

Cámara que colgaba la nominación. Este Tribunal concluyó que el legislador no alegó que en el proceso de confirmación se le hubiesen lesionado sus derechos y prerrogativas constitucionales, por lo que carecía de legitimación activa para impugnar el resultado de los procedimientos. *Id.* en la pág. 887.

Conviene reiterar que, en este caso, los legisladores que procuran impugnar el nombramiento de la licenciada García García ni tan siquiera le votaron en contra, sino que se abstuvieron de votar. Justamente porque decidieron **no votar a favor o en contra** en el proceso de confirmación mediante su abstención, están impedidos de alegar ante los foros judiciales que sus derechos y prerrogativas constitucionales fueron lesionadas durante éste. Sin lugar a duda, pues, y según lo pautado en *Acevedo Vilá*, *supra*, carecen de legitimación activa para impugnar la certificación del resultado de un proceso para el cual se abstuvieron de emitir un voto. El nudo que la mayoría teje para darle la vuelta a este caso tendrá que esperar, supongo, por Alejandro Magno para desenredarlo.

Por último, resulta imperativo destacar que, con relación al requisito de la existencia de un daño corroborable, en *Lozada Sánchez v. JCA*, 184 DPR 898 (2012), una mayoría de este Tribunal se negó a reconocerle legitimación activa a unos vecinos de un proyecto para la construcción de un gasoducto. Conforme a la Declaración de Impacto Ambiental de ese

gasoducto, éste representaba "un impacto ambiental significativo, debido a la extensión territorial que abarca y la diversidad de áreas que atraviesa". *Lozada Sánchez*, 184 DPR en la pág. 928 (citando Declaración de Impacto Ambiental Final para el Proyecto Vía Verde de Puerto Rico, págs. I-7 a I-8 (DIA-F de Vía Verde), disponible en http://www.aeepr.com/viaverde—DIAP2.asp). En aquel momento, los vecinos alegaron que, conforme a la propia Declaración de Impacto Ambiental y otra evidencia presentada, el proyecto representaba "una amenaza directa a su tranquilidad, su salud, su permanencia en sus residencias, el disfrute de sus propiedades y de la naturaleza que las rodea, la utilidad de sus terrenos, su sustento económico, las condiciones ambientales, la seguridad, la calidad de vida y la vida misma de las personas que residen en esas áreas". *Id.*

Al negarle legitimación activa y acceso a los tribunales a este grupo de vecinos, la misma mayoría que hoy suscribe la Opinión que antecede reiteró que "una controversia abstracta, ausente un perjuicio o amenaza real y vigente a los derechos de la parte que los reclama, no presenta el caso y controversia que la Constitución exige para que los tribunales puedan intervenir." *Lozada Sánchez*, 184 DPR en la pág. 917 (citas omitidas). La mayoría razonó que invocar un mero "temor por su seguridad" era insuficiente para demostrar un daño concreto. *Id.* en la pág. 922. Para ser suficiente, se indicó, el daño alegado debía ser "claro, específico y no abstracto,

hipotético y especulativo". *Id.* ¿Cómo esa norma es compatible con este caso? Adivina, adivinador.

En dictámenes posteriores, las expresiones de este Tribunal han sido contundentes al afirmar que, ausente "un daño claro, palpable, inmediato y preciso" o un interés particular real y sustancial, no se le debe reconocer legitimación activa a un ciudadano que desee impugnar un nombramiento por parte del Gobernador. *Véase Torres Montalvo v. Gobernador ELA*, 194 DPR 760, 767 (2016). Asimismo, en *Nieves Huertas v. ELA I*, 189 DPR 611 (2013), caso en el que se impugnaron nombramientos de jueces, fiscales e incluso un Juez Asociado de este Tribunal, se advirtió que reconocerle legitimación activa a unos ciudadanos que alegaban que los nombramientos por parte del Ejecutivo eran inválidos "implicaría que cualquier persona pueda impugnar o hacer cualquier reclamación ante la violación de cualquier ley sin que tenga la necesidad de exponer el daño específico que tal actuación provoca". *Id.* en la pág. 617.[80]

En el caso ante nos, los legisladores también fundamentan su legitimación activa individual en la posibilidad de que sean objeto de un proceso investigativo y acusatorio en el que la licenciada García García funja como Miembro Alterno del

---

[80] En *Nieves Huertas*, *supra*, este Tribunal subrayó, además, que los ciudadanos que impugnaban los nombramientos de los jueces carecían de legitimación activa porque reclamaban "escueta e hipotéticamente . . . una posibilidad de nulidad de los dictámenes emitidos por estos funcionarios". *Nieves Huertas*, 189 DPR en la pág. 617.

Panel del FEI. Esta contención requiere la concurrencia de al menos tres condiciones: (1) que los legisladores sean acusados de cometer o en efecto cometan actos constitutivos de delito que sean objeto de investigación por el Panel del FEI; (2) que uno de los miembros permanentes del Panel del FEI se inhiba de participar en la investigación de los actos que le sean imputados y (3) que la licenciada García García sea asignada como Miembro Alterno al caso.

Más allá de intimar que en algún momento vislumbran ser acusados de delito e investigados por el Panel del FEI, la contención de los legisladores es mucho menos contundente que ese temor por la seguridad física de un grupo de vecinos que fue tan ligeramente atendido (y descartado) por la mayoría de este Tribunal en *Lozada Sánchez, supra*. Hoy, el temor de unos legisladores a ser acusados e investigados por un Panel del FEI que podría constituirse por un miembro alterno por el cual se abstuvieron de votar a favor o en contra aparenta ser más que suficiente.

## III.

Convencida de que los legisladores peticionarios carecen de legitimación activa para incoar un reclamo ante los tribunales, disiento de la Opinión que se suscribe hoy. En nuestro Estado de Derecho no debe haber cabida para excepciones, extravíos, decisiones rebuscadas y nudos gordianos tejidos, que respondan a intereses exógenos a

nuestro deber constitucional de impartir justicia de manera imparcial. Determinar la legitimación activa de una parte únicamente en función de la naturaleza de su reclamo y en cómo algunos miembros de este Foro se identifican o sensibilizan con éste es una práctica antijurídica, antidemocrática y anticonstitucional. Al margen de las percepciones de algunos integrantes de este Tribunal sobre los méritos del reclamo incoado por los legisladores, el hecho de que éstos incumplan con los requisitos mínimos de la doctrina de legitimación activa -según aplicados anteriormente de forma tan rigurosa y restrictiva por la propia mayoría- ameritaba la desestimación, sin más, de este pleito. Es en casos como éste, en los cuales la "norma" que se pauta está completamente desligada de nuestros dictámenes previos, que se desgasta nuestra imagen de imparcialidad y se desvanece la buena voluntad que como Institución nos agenciamos recientemente en *Senado de Puerto Rico v. Gobierno de Puerto Rico*, 2019 TSPR 138.


                              Anabelle Rodríguez Rodríguez
                                    Juez Asociada

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Honorable María de Lourdes Ramos Rivera, por sí y como Vicepresidenta de la Cámara de Representantes de Puerto Rico y el Honorable Carlos Méndez Núñez, por sí y como Presidente de la Cámara de Representantes de Puerto Rico

   Peticionarios

     v.

Licenciada Emmalind García García

   Recurrida

CC-2018-0197  *Certiorari*

Opinión Disidente emitida por el Juez Asociado señor COLÓN PÉREZ.

En San Juan, Puerto Rico a 27 de septiembre de 2019.

Si bien en el pasado hemos reconocido que, en determinadas circunstancias, los miembros de la Asamblea Legislativa del país tienen legitimación activa para vindicar lesiones a sus poderes y prerrogativas constitucionales, somos del criterio que en esta ocasión -- **al estar ante un escenario matizado por alegaciones abstractas, hipotéticas y totalmente especulativas** -- no se cumplieron las exigencias impuestas por la referida vertiente de la doctrina de justiciabilidad. Lo anterior, por sí solo, y en correcto derecho, exigía que el presente caso fuese desestimado.

Al no ser ese el criterio mayoritario, enérgicamente disentimos. Veamos.

I.

Los hechos medulares que dan margen al presente litigio no están en controversia y éstos se recogen con particular precisión en la Opinión que hoy emite este Tribunal, razón por la cual hemos decidido adoptar los mismos por referencia. Procedemos, pues, con la exposición del derecho aplicable.

A.

Como es sabido, en nuestra jurisdicción los tribunales estamos llamados a atender únicamente aquellas controversias que sean justiciables. *P.I.P. v. E.L.A*, 186 DPR 1 (2012); *Lozada Sánchez v. JCA*, 184 DPR 898 (2012); *Asoc. Fotoperiodistas v. Rivera Schatz*, 180 DPR 920 (2011). Ello es así, puesto que, desde hace ya varias décadas atrás, decidimos adoptar -- por vía jurisprudencial -- tal requisito de autolimitación judicial existente en la jurisdicción federal. *Asoc. de Periodistas v. González*, 127 DPR 704 (1991), esc. 6; *Estado Libre Asociado de P.R. v. Aguayo*, 80 DPR 552 (1958). Véase, además, J. J. Álvarez González, *Derecho constitucional de Puerto Rico y relaciones constitucionales con los Estados Unidos*, Bogotá, Ed. Temis, 2009, pág. 97.

En esencia, la doctrina de justiciabilidad busca evitar la obtención de un fallo sobre una controversia que en realidad no existe, una determinación sobre un derecho que no ha sido reclamado, o una sentencia que, en el

momento en que se dicta, no podrá tener efectos prácticos sobre una controversia. *Moreno v. Pres. U.P.R. II*, 178 DPR 969 (2010); *Estado Libre Asociado de P.R. v. Aguayo*, *supra*. Dicho de otro modo, los tribunales sólo están llamados a atender controversias genuinas y vivas, donde existan intereses opuestos y que, al resolverse, tengan efecto sobre las relaciones jurídicas entre las partes en el pleito. *Asoc. Fotoperiodistas v. Rivera Schatz*, *supra*; *Noriega v. Hernández Colón*, 135 DPR 406 (1994); *Estado Libre Asociado de P.R. v. Aguayo*, 80 DPR 552 (1958).

B.

Una de las vertientes de la doctrina de justiciabilidad es aquella que se conoce como legitimación activa. Ésta busca que "el promovente de [determinada] acción [sea] uno cuyo interés es de tal índole que, con toda probabilidad, habrá de proseguir su causa de acción vigorosamente y habrá de traer a la atención del tribunal las cuestiones en controversia". *Asoc. Fotoperiodistas v. Rivera Schatz*, *supra*; *Hernández Torres v. Hernández Colón et al.*, 131 DPR 593 (1992); *Hernández Agosto v. Romero Barceló*, 112 DPR 407, (1982).

**Así pues, para que en un litigio se le reconozca legitimación activa a una parte ésta debe satisfacer los siguientes requisitos: (1) haber sufrido un daño claro y palpable; (2) el referido daño debe ser real, inmediato y preciso, no abstracto o hipotético; (3) debe existir una**

**conexión entre el daño sufrido y la causa de acción ejercitada, y (4) la causa de acción debe surgir al amparo de la Constitución o de una ley.** *Bhatia Gautier v. Gobernador*, 199 DPR 59 (2017); *Col. Peritos Elec. v. A.E.E.*, 150 DPR 327 (2000); *Hernández Torres v. Gobernador*, 129 DPR 824 (1992).

Sobre el particular, pero ya más en específico en lo relacionado a aquellos escenarios donde los miembros de la Asamblea Legislativa comparecen como partes en un litigio, este Tribunal ha reconocido que éstos "tiene[n] acción legitimada para defender un interés individual tradicional, vinculado con el proceso legislativo o como representante[s] oficialmente nombrado[s] por el cuerpo para impugnar una actuación ejecutiva". *Hernández Torres v. Gobernador*, *supra*, pág. 837. **Para así hacerlo, hemos sentenciado que los miembros de la Asamblea Legislativa deberán cumplir con los mismos requisitos de legitimación activa que se exigen a cualquier ciudadano particular, razón por la cual deben demostrar haber sufrido un daño claro, palpable, real e inmediato a sus prerrogativas legislativas o no haber contado con los mecanismos razonables y necesarios que le permitiesen su participación plena en todas las etapas esenciales del proceso legislativo.** *Bhatia Gautier v. Gobernador*, *supra*; *Hernández Torres v. Hernández Colón et al.*, *supra*; *Hernández Torres v. Gobernador*, *supra*. **Es decir, estos no pueden satisfacer las exigencias que plantea la doctrina de legitimación**

**activa invocando prerrogativas abstractas y desligadas del ejercicio de sus funciones legislativas.** *Bhatia Gautier v. Gobernador, supra; Asoc. Fotoperiodistas v. Rivera Schatz, supra; Noriega v. Hernández Colón, supra; Hernández Torres v. Hernández Colón et al., supra.*

**Cónsono con lo anterior, también hemos señalado que, al atender reclamos instados por los miembros de la Asamblea Legislativa, "[l]os tribunales deberán quedar convencidos de que no se trata de un traslado del debate legislativo al foro judicial y sí de una verdadera lesión a sus prerrogativas legislativas".** (Énfasis suplido) *Hernández Torres v. Hernández Colón et al., supra,* pág. 601.[81] A este último señalamiento, el juzgador o juzgadora debe prestar particular atención.

Dicho ello, a modo de ejemplo, es menester señalar que en nuestra jurisdicción se ha reconocido legitimación a los miembros de la Asamblea Legislativa en los siguientes escenarios: cuando se cuestiona la elegibilidad de un legislador para ocupar un escaño legislativo (*Santa Aponte v. Srio. de Hacienda,* 105 DPR 750 (1977); cuando un cuerpo legislativo busca vindicar su derecho a brindar su consejo y consentimiento a los integrantes del gabinete de un gobernador que ha sido reelegido *(Hernández Agosto v. Romero Barceló, supra);* cuando se impugnan ciertas reglas

---

[81] *En Acevedo Vilá v. Meléndez,* 164 DPR 875 (2005), este Tribunal resolvió que un miembro de la Asamblea Legislativa no tiene legitimación activa para impugnar cierto resultado certificado por la Cámara de Representantes, a menos que alegue que durante el proceso se violó alguno de sus derechos o prerrogativas constitucionales.

que coartan el derecho constitucional de las minorías a participar en los procedimientos celebrados en las comisiones del Senado (*Silva v. Hernández Agosto*, 118 DPR 45 (1986); cuando una regla interna de uno de los cuerpos legislativos impide registrar la abstención de los legisladores en una votación (*Acevedo Vilá v. Meléndez*, 164 DPR 875 (2005)); y cuando un legislador alega que se le está violando su derecho constitucional a obtener acceso a información pública (*Bhatia Gautier v. Gobernador, supra*).

Por otro lado, este Tribunal ha establecido que los miembros de la Asamblea Legislativa no tienen legitimación activa para iniciar un litigio cuando éstos o éstas pretenden demandar en representación de sus votantes o del interés público. *Acevedo Vilá v. Meléndez*, *supra*. **De igual modo, a éstos o éstas tampoco se les ha reconocido legitimación activa para demandar bajo el pretexto de que se le han afectado sus prerrogativas constitucionales, cuando han tenido participación plena en todas las etapas de los procesos legislativos.** *Íd*.

Sobre este último escenario, y por ser en extremo pertinente para la correcta disposición de la controversia que nos ocupa, es menester señalar aquí que en *Noriega v. Hernández Colón*, *supra*, resolvimos que un miembro de la Asamblea Legislativa no tenía legitimación activa para incoar cierto litigio, toda vez que éste no se opuso a la aprobación de las medidas legislativas que luego impugnó por la vía judicial. En esa ocasión, expresamos que "[e]n

vista de que [el legislador] no combatió legislativamente [las medidas impugnadas], somos del criterio que la aprobación de las mismas […] no le causó un daño claro y palpable a sus prerrogativas legislativas". *Íd.*, pág. 433.

Es, precisamente, a la luz de la normativa antes expuesta -- y no de otra -- que este Tribunal debió atender las controversias ante su consideración. Como una mayoría del Tribunal no lo hizo, procedemos a así hacerlo.

## II.

Como correctamente se recoge en la Opinión que hoy emite este Tribunal, en el presente caso, allá para el mes de enero de 2017, los representantes Carlos Méndez Núñez y María de Lourdes Ramos Rivera acudieron al Tribunal de Primera Instancia e instaron el litigio que nos ocupa por entender que, aunque la nominación de la licenciada García García al cargo de Miembro Alterno del PFEI fue declarada como aprobada por la Cámara de Representantes de Puerto Rico, ésta en realidad no obtuvo los votos necesarios para ser confirmada por dicho cuerpo legislativo. Al respecto, los mencionados representantes plantearon que la *Ley del Fiscal Especial Independiente*, según enmendada, Ley Núm. 2 de 23 de febrero de 1988, 3 LPRA sec. 99h *et seq.*, exigía que los miembros del PFEI contasen con el consejo y consentimiento de la mayoría del número total de miembros que componían el Senado y la Cámara de Representantes. Sin embargo, estos sostuvieron que, en lo relacionado al nombramiento de la licenciada García García como Miembro

Alterno del PFEI, la votación final en la Cámara de Representantes fue de veinticuatro (24) votos a favor, cero (0) en contra, catorce (14) abstenidos y trece (13) ausentes. Siendo ello así, y según argumentaron los representantes Méndez Núñez y Ramos Rivera, la licenciada García García no obtuvo suficientes votos para su confirmación, pues al momento de la votación, la Cámara de Representantes estaba compuesta por cincuenta y un (51) miembros, por lo que se requerían veintiséis (26) votos a favor de su nominación.

Enterada de lo anterior, la licenciada García García solicitó la desestimación de la causa de acción incoada en su contra por entender que los representantes que instaron la misma carecían de legitimación activa para ello. A juicio de ésta, los representantes Méndez Núñez y Ramos Rivera no demostraron haber sufrido un daño claro, palpable, real e inmediato en sus prerrogativas legislativas.

A dicha solicitud, los mencionados representantes se opusieron. En esencia, basaron su reclamo de poseer legitimación activa para llevar la causa de epígrafe en que: (1) permitir que la nominada permaneciese en su cargo tendría el efecto de anular sus votos de abstención, afectando así sus prerrogativas legislativas y (2) en que, como miembros de la Asamblea Legislativa, se encuentran sujetos a la autoridad investigativa del PFEI.

Evaluados los planteamientos de ambas partes, el Tribunal de Primera Instancia desestimó el caso de marras por entender que los representantes Méndez Núñez y Ramos Rivera carecían de legitimación activa para presentar el mismo. Dicha determinación fue confirmada por el Tribunal de Apelaciones. Tanto el foro primario, como el foro apelativo intermedio, actuaron correctamente.

**Y es que, a todas luces, los fundamentos esgrimidos por los mencionados representantes no hacen justiciable el caso ante nuestra consideración.** Dos son las razones que nos mueven a concluir lo anterior.

En primer lugar, en cuanto a la alegación de los representantes Méndez Núñez y Ramos Rivera respecto a que permitir que la licenciada García García permaneciese en su cargo tendría el efecto de anular sus votos, debemos dejar meridianamente claro que los mencionados legisladores se abstuvieron de votar en lo relacionado al referido nombramiento. Es decir, no votaron ni a favor ni en contra del nombramiento de la licenciada García García.

**Sobre el particular, como mencionamos anteriormente, basta con señalar que en _Noriega v. Hernández Colón, supra_, este Tribunal resolvió que un miembro de la Asamblea Legislativa no tenía legitimación activa para incoar cierto litigio, toda vez que éste no se opuso a la aprobación de las medidas legislativas que luego impugnó por la vía judicial.** Sentenciamos en esa ocasión que, "[e]n vista de que [el legislador] no combatió legislativamente [las

medidas impugnadas], somos del criterio que la aprobación de las mismas […] no le causó un daño claro y palpable a sus prerrogativas legislativas". *Íd.*, pág. 433.

Lo anterior, aunque en un contexto distinto, fue precisamente lo que ocurrió en el presente caso. Aquí los legisladores Méndez Núñez y Ramos Rivera decidieron cruzarse de brazos y, en el **foro legislativo**, no cuestionaron el nombramiento de la licenciada García García. No obstante, ahora, ante el **foro judicial**, pretenden hacerlo sin haber sufrido un daño claro, palpable, real e inmediato que les otorgue legitimación activa para ello.

De otra parte, los representantes Méndez Núñez y Ramos Rivera tampoco alegaron haber sido privados de una participación activa y plena en todas las etapas críticas del proceso legislativo relacionado con la confirmación de la licenciada García García. Recordemos que en *Acevedo Vilá v. Meléndez*, *supra*, precisamente en el contexto de una disputa sobre si una votación de la Cámara de Representantes resultó en una confirmación válida, este Tribunal resolvió que un legislador no tenía legitimación activa para impugnar el resultado certificado por la Cámara de Representantes, a menos que se alegase que durante el mencionado proceso se le violó algún derecho o prerrogativa, cosa que tampoco ocurrió. Lo dicho hasta ahora, por sí solo, era razón suficiente para desestimar el caso de marras, como correctamente lo hizo el Tribunal de

Primera Instancia, dictamen que fue confirmado por el Tribunal de Apelaciones.

Ahora bien, independientemente de lo anterior, en segundo lugar, es menester señalar que el mero hecho de poder estar sujetos a ser investigados por el PFEI, como alegan los representantes Méndez Núñez y Ramos Rivera, tampoco es una razón suficiente que les conceda a éstos legitimación activa para, en escenarios como los que están aquí en controversia, acudir al Tribunal a vindicar sus alegados *derechos*. **Estas son, <u>como mínimo</u>, alegaciones abstractas, hipotéticas y totalmente especulativas.**

Adviértase que no se alega aquí que los mencionados representantes son objeto de alguna investigación, o víctimas de determinada actuación por parte del PFEI. Mucho menos se argumenta alguna participación en un proceso de esta naturaleza por parte de la licenciada García García, funcionaria que éstos aducen no posee los requisitos en ley para formar parte -- como Miembro Alterno -- del PFEI.

Como bien se desprende de la Opinión que hoy emite este Tribunal, en las alegaciones que forman parte de su demanda, los representantes Méndez Núñez y Ramos Rivera se limitan a manifestar su preocupación respecto a que, en su día, éstos pudiesen ser investigados por el PFEI con la participación de la licenciada García García (en la eventualidad de que alguno de sus miembros en propiedad no pudiese intervenir), lo que le causaría un daño. Como ya mencionamos, lo anterior por sí solo, tampoco le concede

legitimación activa a un miembro de la Asamblea Legislativa para tocar las puertas de un Tribunal.

**En fin, ¿dónde está el daño claro, palpable, real e inmediato que exige nuestra jurisprudencia para poder reconocerle legitimación activa a los representantes en cuestión para incoar el presente litigio?** En el caso de marras simplemente no existe.

**Recordemos que, al atender acciones promovidas por miembros de la Asamblea Legislativa, el juzgador o juzgadora debe "quedar [convencido o convencida] de que no se trata de un traslado del debate legislativo al foro judicial y sí de una verdadera lesión a sus prerrogativas legislativas".** (Énfasis suplido) *Hernández Torres v. Hernández Colón et al.*, *supra*, pág. 601. Aquí, a todas luces, se pretendió trasladar el debate legislativo a este Tribunal. A esa pretensión -- al menos para quien suscribe -- no podemos acceder. No se cometieron los errores señalados.

III.

Es, pues, por los fundamentos antes expuestos que enérgicamente disentimos del proceder de una mayoría de este Tribunal en el día de hoy.

Ángel Colón Pérez
Juez Asociado